BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN: 175783)
Albert Y. Chang (SBN: 296065)
Yury A. Kolesnikov (SBN: 271173)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002

*Attorneys for Plaintiff Arthur Fischman*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR FISCHMAN, derivatively on behalf of SEMPRA ENERGY and SOUTHERN CALIFORNIA GAS COMPANY, <br><br> Plaintiff, <br><br> DEBRA L. REED, JOSEPH A. HOUSEHOLDER, STEVEN D. DAVIS, JUSTIN C. BIRD, WILLIAM C. RUSNACK, WILLIAM D. JONES, WILLIAM G. OUCHI, JAMES G. BROCKSMITH, JR., WILLIAM P. RUTLEDGE, LYNN SCHENK, ALAN L. BOECKMANN, JACK T. TAYLOR, JAMES C. YARDLEY, KATHLEEN L. BROWN, PABLO A. FERRERO, LUIS M. TELLEZ, DENNIS V. ARRIOLA, JIMMIE I. CHO, DOUG SCHNEIDER, MICHAEL M. SCHNEIDER, SCOTT FURGERSON, GEORGE MINTER, J. BRET LANE, MARTHA B. WYRSCH, JESSE J. KNIGHT, JR., and DOES 1-25, Inclusive, <br><br> Defendants, <br> -and- <br><br> SEMPRA ENERGY, a California corporation, and SOUTHERN CALIFORNIA GAS COMPANY, a California corporation, <br><br> Nominal Defendants. | CASE NO. **'16CV1006 WQHNLS** <br><br> (Derivative Action) <br><br> VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, BREACH OF THE DUTY OF HONEST SERVICES, AND AIDING AND ABETTING BREACH OF FIDUCIARY DUTY <br><br> DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

NATURE AND SUMMARY OF THE ACTION ..................................................1

JURISDICTION AND VENUE ........................................................................8

THE PARTIES ..................................................................................................9

DUTIES OF THE INDIVIDUAL DEFENDANTS ........................................20

SUBSTANTIVE ALLEGATIONS ..................................................................23

    A.    The Board's Direct Responsibility for the Misconduct Alleged
Herein ..............................................................................................23

    B.    Defendants Knew That Sempra and Its Subsidiary Utilities
Operate in a Highly Regulated Field, Subject to Intense
Governmental Oversight ..................................................................25

    C.    The Aliso Canyon Well and Defendants' Intentional Decision
to Relegate Well Safety (as Opposed to Pipeline Safety) to
Stepchild Status ...............................................................................27

    D.    The Board Was Intimately Aware that the Well Posed
Substantial Risks to the Environment and Surrounding
Communities .....................................................................................38

    E.    The Defendants' Wrongful Conduct Causes the Company to
be Sued in Dozens of Cases, Exposing the Company to
Hundreds of Millions of Dollars in Damages .................................45

    F.    Defendants Boeckmann, Ouchi, Rusnack, Rutledge, and
Schenk Reward the Company's Top Executives With Huge
Bonuses for 2015, Notwithstanding the Disastrous Aliso
Canyon Well Leak ............................................................................47

FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING .................48

DAMAGES TO SEMPRA ...............................................................................49

DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS .........................50

    A.    Demand Is Excused Because the Director Defendants Face a
Substantial Likelihood of Liability for Their Misconduct ..............50

CAUSES OF ACTION .......................................................................................... 54

    COUNT I

    Against the Individual Defendants and Does 1-25 for Breach
    of Fiduciary Duty ................................................................................. 54

    COUNT II

    For Breach of the Duty of Honest Services (Against
    Defendants Reed, Householder, Davis, Bird, Arriola, Cho, D.
    Schneider, M. Schneider, Furgerson, Minter, Lane and
    Wyrsch) ............................................................................................... 56

    COUNT III

    Aiding and Abetting Breaches of Fiduciary Duties (Against
    All Individual Defendants) .................................................................. 57

PRAYER FOR RELIEF ........................................................................................ 58

JURY TRIAL DEMAND ....................................................................................... 60

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Arthur Fischman ("Plaintiff"), derivatively on behalf of Sempra Energy and Southern California Gas Company (hereafter "Sempra Energy" or the "Company"), submits this Shareholder Derivative Complaint against the members of the companies' Board of Directors (the "Board") (collectively, the "Individual Defendants") for breaches of their fiduciary duties, gross mismanagement, abuse of control, and unjust enrichment. Plaintiff makes the following allegations, except as to allegations pertaining to Plaintiff (which are based on personal knowledge), based on the investigation of counsel, including a review of legal and regulatory filings, press releases, analyst and media reports about the Company, and other public statements issued by the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1. This is a stockholder derivative action brought by plaintiff on behalf of nominal defendants Sempra Energy ("Sempra") and Southern California Gas Company ("SoCalGas"), against certain officers and directors of Sempra and SoCalGas (collectively, the "Company") for breaches of fiduciary duties and violations of law from April 20, 2010 to the present ("Relevant Period"). This shareholder derivative action involves breaches of fiduciary duties by Defendants in connection with knowingly causing the Company to underspend on safety measures and remediation efforts at the Company's Aliso Canyon underground storage well (the "Well"), leading to a massive natural gas leak which existed for years at the well, but was first discovered in October 2015.[1] On January 6, 2016, after the leak had been publicly disclosed for months without abatement, California Governor Jerry Brown declared a state of emergency. The leak was not

---

[1] SoCalGas discovered the leak on or about October 23, 2015, but waited until October 26, 2015 to report the leak to the general public.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1  capped until February 18, 2016, by which time it had become ***the largest***

2  ***methane leak in U.S. history***.

3      2.    Methane is a greenhouse gas that is more than 80 times more potent

4  than carbon dioxide.  The potency of methane has resulted in the fact that

5  scientists have stated that the Aliso gas leak carbon footprint is said to be larger

6  than the Deepwater Horizon leak in the Gulf of Mexico.[2]

7      3.    As the Company admitted in its most recent Annual Report filed

8  with the SEC on Form 10-K on February 26, 2016:

9  - "Various governmental agencies, including the DOGGR, Los
10  Angeles County Department of Public Health, SCAQMD, CARB,
11  CPUC, EPA, Los Angeles District Attorney's Office, and California
   Attorney General's Office, are investigating this incident."

12  - "As of February 24, 2016, 83 lawsuits have been filed against
   SoCalGas, some of which have also named Sempra Energy"

13  - "On February 2, 2016, the Los Angeles District Attorney's Office
14  filed a misdemeanor criminal complaint against SoCalGas seeking
15  penalties for alleged failure to provide timely notice of the leak
   pursuant to California Health and Safety Code section 25510(a), Los
16  Angeles County Code section 12.56.030, and Title 19 California
   Code of Regulations section 2703(a), and for violating California
17  Health and Safety Code section 41700 prohibiting discharge of air
18  contaminants that cause annoyance to the public."

19  - "On January 6, 2016, the Governor of the State of California issued
20  an order (the Governor's Order) proclaiming a state of emergency to
   exist in Los Angeles County due to the natural gas leak at the Aliso
21  Canyon facility. The Governor's Order implements various orders
22  with respect to:

23  [2]   *See* Sarah Zielinski, "The Size of the California Methane Leak Isn't the
   Scariest Part of the Story," SMITHSONIAN.ORG, Feb. 26, 2016, available at
24  http://www.smithsonianmag.com/science-nature/size-california-methane-leak-
25  isnt-scariest-part-story-180958234/?no-ist, last visited Mar. 25, 2016; *See also*
   Amy Goodman, "Erin Brockovich: California Methane Gas Leak is Worst U.S.
26  Environmental Disaster Since BP Oil Spill," DEMOCRACY NOW, Dec. 30, 2015,
27  available at http://www.democracynow.org/2015/12/30/ erin_ brockovich _
   california_methane_gas_leak, last visited Mar. 25, 2016.
28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- stopping the leak;
- protecting public health and safety;
- ensuring accountability; and
- strengthening oversight.

4.   The wrongdoing associated with the leak has already cost the Company more than $50 million in remediation costs.  Sempra and SoCalGas have also experienced significant damages to their reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to billions of dollars in potential liability for violations of state and federal law.  Indeed, as the Company admitted in its Annual Report filed February 26, 2016:

> "The costs to comply with the various laws, orders, rules and regulations arising out of this incident could be significant, and to the extent not covered by insurance or in customer rates, such costs could have a material adverse effect on SoCalGas' and Sempra Energy's cash flows, financial condition and results of operations."

5.   Significantly, with respect to the more than 83 lawsuits that have been filed against SoCalGas, many of the lawsuits name as defendants Does 1-100, who have been identified in part as those responsible for the oversight of Aliso Canyon. Upon information and belief, the naming of these Doe defendants is meant to preserve claims against some of the Individual Defendants named herein, who were responsible to ensure that Sempra's SoCalGas was operating safely. Specifically, the complaint filed by the Los Angeles City attorney, the Attorney General of California and the County Counsel for the County of Los Angeles, *The People of the State of California v. Southern California Gas Company and Does 1-50*, Consolidated Case No. BC602973 (hereinafter "*State v. SoCalGas*"), names:

> At all relevant times, DOES 26-50 were in a position of responsibility allowing them to influence corporate policies or activities with respect to SoCalGas's compliance with California

3

laws and regulations at its facilities and in the conduct of its business in the State of California, and had, by reason of their position in the corporation, responsibility and authority either to prevent in the first instance, or promptly correct, the violations complained of herein, but failed to do so. In addition to any direct personal liability of these individuals, DOES 26-50, also are personally liable under the responsible "corporate officer doctrine" for violations of law committed by SoCalGas as alleged herein.

6.     As set forth herein, the Individual Defendants directly participated in the wrongdoing that has caused massive liability for the Company, and are liable to the Company for such damages.

7.     SoCalGas is a wholly-owned subsidiary of Sempra and provides natural gas distribution and storage services.  Sempra is an energy-services holding company whose operating units invest in, develop, and operate energy infrastructure, and provide gas and electricity services to their customers in North and South America.

8.     When the Company discovered the massive gas leak at Sempra's Aliso Canyon natural gas storage reservoir October 23, 2015, it did not report the leak immediately as required by law.  Instead Sempra and SoCalGas waited days to notify state and federal agencies.

9.      Moreover, the Individual Defendants named as defendants herein consciously failed to cause the Company to take prompt and sufficient corrective actions to limit the damages caused to individuals, homeowners, and the Company itself from the leak.  In fact, the Individual Defendants delayed more than a month in implementing a contingency plan for plugging the well.  As a result, the well was not plugged until February 2016, and substantial damages were caused by the Company's unacceptably slow response to the leak.

10.     The Individual Defendants also caused the Company to issue false and misleading statements regarding the leak, including the fact that the "leak does not pose an imminent threat to public safety."  Notwithstanding dozens of

4

health complaints from homeowners adjacent to the well, including reports of nosebleeds, vomiting, and headaches, the Individual Defendants consciously failed to cause the Company to take necessary swift and substantial corrective action to protect the health of the public and limit additional liability of the Company.

11.    Due to the Individual Defendants' conscious abdication of their fiduciary duties, the Los Angeles County Department of Public Health ("Health Department") eventually had to force Sempra to begin to take appropriate action. Specifically, on November 19, 2015, the Health Department ordered Sempra to expedite leak abatement and to provide free, temporary relocation to any residents affected by the gas leak.  On December 4, 2015, more than one month after SoCalGas crews stated they discovered the leak, Sempra finally began the slow process of constructing the relief well.

12.    As a result of the Individual Defendants' breaches of fiduciary duties, the Company is being sued by multiple governmental entities, including the California Attorney General, for creating and failing to abate a nuisance and violation of the following California laws:  Cal. Health & Safety Code §41700; Cal. Bus. & Prof. Code §17200; Cal. Health & Safety Code §25510; Cal. Civil Code §3479; C.C.P. §731; and Cal. Gov't Code §12607.

13.    The leak at the Well should not have come as a surprise.  In fact, the Well has been slowly leaking for over thirty-six years.  Further, five years ago, SoCalGas requested and obtained regulatory permission to increase rates to replace the many leaking valves at the Aliso Canyon storage field.  Following the leak, initial reports about the Well failure suggested that the safety valve failed. Subsequent discovery, however, revealed that there was no safety valve at all. SoCalGas purportedly told the California Division of Oil, Gas and Geothermal Resources ("DOGGR") that it "replaced" the safety valve in 1979.  In December 2015, however, SoCalGas admitted that Sempra actually removed the valve in

5

1979 because it was old at the time, leaking, and it was difficult to find parts for and then failed to repair or replace it. The Well, therefore, was a time bomb that the Individual Defendants knew would eventually go off.

14. Due to Sempra's cavalier disregard for safety, since October 2015 and continuing through the present, toxic gases have been continuously escaping from the Well at an astonishing rate of over 100,000 pounds per hour. In fact, the Well is now responsible for upwards of 25% of all methane that is currently being released in California. According to the U.S. Environmental Protection Agency, "[p]ound for pound, the comparative impact of [methane] on climate change is more than 25 times greater than [carbon dioxide] over a 100-year period."

15. In addition to devastating environmental damage, the leak has caused a severely increased risk of fire in the affected area.

16. Moreover, in the interim months since the leak began, residents of Porter Ranch and portions of Chatsworth, Granada Hills, and Northridge have been exposed to an uninterrupted flow of methane mixed with various toxic gases like benzene (a known carcinogen), toluene (which causes acute and chronic damage to the central nervous system), and hydrogen sulfide and sulfur dioxide (which produce a sickening rotten egg smell). Local residents have suffered numerous physical problems as a result, including neurological, gastrointestinal, and respiratory ailments, dizziness, light-headedness, nausea, vomiting, headaches, and nosebleeds. To make matters worse, these toxic gases and chemicals have likely also now leaked into the local aquifer, which may lead to local crop destruction as well as additional environmental harm.

17. Thousands of local residents have requested that Sempra provide temporary relocation while the gases continue to spew from the reservoir. Sempra, however, has responded woefully inadequately and painfully slowly. As a result, on December 22, 2015, the Los Angeles City Attorney filed an *ex parte* application for a temporary restraining order ("TRO"), seeking to compel Sempra

6

1   to improve its relocation process.  In its application, the City Attorney described

2   numerous instances in which Sempra failed to: (i) provide timely relocation; (ii)

3   provide suitable alternative housing; (iii) properly accommodate persons with

4   disabilities; and/or (iv) properly accommodate persons and families with pets.[3]

5       18.     On January 6, 2016, California Governor Edmund G. Brown Jr.

6   declared a state of emergency.  Also in January 2016, Sempra and SoCalGas filed

7   a Current Report on Form 8-K with the U.S. Securities and Exchange

8   Commission ("SEC") disclosing: (i) as of January 3, 2016, approximately 2,500

9   households have been temporarily relocated; (ii) at least 1,460 additional

10   households had requested temporary relocation but had not yet been

11   accommodated for by Sempra; (iii) Sempra was required to pay for additional

12   overtime and costs associated with extra Los Angeles Police Department security

13   patrols, among other things; (iv) multiple governmental agencies are currently

14   investigating the leak; (v) at least twenty-five complaints have been filed by

15   affected residents against Sempra and/or SoCalGas; (vi) the Los Angeles City

16   Attorney filed a complaint against SoCalGas seeking an order to abate the public

17   nuisance and impose civil penalties; (vii) Sempra has already expended $50

18   million addressing the leak and fallout, and will continue to incur significant costs

19   until the Well is capped.

20       19.     Sempra's Board of Directors (the "Board"), as well as the other

21   Individual Defendants, are responsible for the damages the Company has already

22   suffered and those that it will have to pay in the future.  The Company's Board

23   and its executive officers have ultimate responsibility for all the Company's

24   operations, as admitted in the Company's Proxy Statement:  "Our business and

25   _____

26   [3]    The TRO was later consolidated with certain other individual actions

27   against the Company, and on February 2, 2016, those plaintiffs filed a second
     amended complaint for civil penalties, permanent injunction, and other equitable

28   relief.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

affairs are managed and all corporate powers are exercised under the direction of our Board of Directors. The board establishes fundamental corporate policies and oversees the performance of the company and our Chief Executive Officer and the other officers to whom the board has delegated day-to-day business operations."[4]

20.   As a result of their breaches of fiduciary duties, the Individual Defendants should be held liable to the Company for all damages caused to the Company by the defendants' wrongdoing.

## JURISDICTION AND VENUE

21.   Subject-matter jurisdiction exists under 28 U.S.C. § 1332 because there is complete diversity between plaintiff and defendants and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

22.   Venue is proper in the Southern District of California under 28 U.S.C. §§ 1391 and 1401 because Sempra Energy maintains its principal executive offices in this District at 488 8th Avenue, San Diego, CA 92101, and because a substantial portion of the acts and conduct complained of herein — including the defendants' breaches of fiduciary duties — occurred in this District.

23.   Each defendant has minimum contacts with this District, as they have entered into contracts in this District, or have frequently traveled here, on Sempra's business, or have authorized acts and actions that have had a sufficient impact in this District or on Sempra's shareholders and investors residing here to justify the exercise of jurisdiction over them.

---

[4]   *See* Sempra's 2016 Proxy Statement filed on Schedule 14A with the SEC on March 25, 2016, at p. 10.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

# THE PARTIES

**Plaintiff**

24.     Plaintiff Arthur Fischman was a stockholder of Sempra at the time of the wrongdoing complained of, has continuously been a stockholder of Sempra Energy since the Company's inception in 1998, and is a current Sempra stockholder.  Plaintiff is a citizen of Pennsylvania.

**Nominal Defendants**

25.     Nominal defendant Sempra is a California corporation with principal executive offices at 488 8th Avenue, San Diego, California.  Sempra is a Fortune 500 energy-services holding company whose operating units invest in, develop, and operate energy infrastructure, and provide gas and electricity services to their customers in North and South America.  Sempra's operations are divided principally between its California Utilities subsidiaries, San Diego Gas & Electric Company ("SDG&E") and SoCalGas, and Sempra International and Sempra U.S. Gas & Power. Sempra is a citizen of California.

26.     Nominal defendant SoCalGas is a California corporation with principal executive offices at 555 West Fifth Street, Los Angeles, California. SoCalGas is a regulated, wholly owned subsidiary of Pacific Enterprises, which is a wholly owned subsidiary of Sempra.  Sempra indirectly owns all the common stock and substantially all of the voting stock of SoCalGas.  SoCalGas provides natural gas distribution and storage services to 21.4 million customers through 5.9 million meters in more than 500 communities.  SoCalGas is a citizen of California.

**Defendants**

27.     Defendant Debra L. Reed ("Reed") is Sempra's Chairman of the Board and has been since December 2012; and Chief Executive Officer ("CEO") and a director and has been since June 2011.  Reed has served in various positions at both Sempra and SoCalGas since she first joined SoCalGas in 1978.

9

Defendant Reed has also served in a variety of executive positions at Sempra since being appointed President of SDG&E in 2000, including SDG&E's and SoCalGas's President and CEO from October 2006 to March 2010; and Sempra's Executive Vice President from April 2010 to June 2011. From 2004 to 2006, Reed was president and chief operating officer of SDG&E and SoCalGas and, before that, president of SDG&E and chief financial officer of both companies. Defendant Reed either knew, was reckless, or was grossly negligent in not knowing, that the Well was unsafe and Sempra lacked an appropriate contingency plan in the event of a leak at the Well. Defendant Reed further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so. Reed is a citizen of California.

28.     Defendant Joseph A. Householder ("Householder") is a director of SoCalGas. He is also Sempra's Executive Vice President and Chief Financial Officer and has been since October 2011. Defendant Householder was also Sempra's Senior Vice President, Controller, and Chief Accounting Officer from 2006 to 2011, where he was responsible for financial reporting, accounting and controls, and tax functions for all of Sempra Energy's companies, including Sempra and SoCalGas. Defendant Householder either knew, was reckless, or was grossly negligent in not knowing that the SS-25 Well was unsafe and Sempra lacked an appropriate contingency plan in the event of a leak at the Well. Defendant Householder further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so. Householder is a citizen of California.

29.     Defendant Steven D. Davis ("Davis") is Sempra's Executive Vice President, External Affairs and Corporate Strategy, and has been since September 2015. As executive vice president of external affairs and corporate strategy,

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Davis oversees government relations, regulatory and international affairs, and communications, as well as corporate social responsibility and long-term strategy review, for Sempra Energy.  Defendant Davis has served in a variety of positions since joining SDG&E in 1981.  From 2012 to 2014, Davis served as senior vice president of external affairs for Sempra Energy and, prior to that, was Sempra Energy's vice president of investor relations and corporate communications. From 2006 to 2010, Davis was Sempra Energy's vice president of communications and community partnerships, where he oversaw the company's communications and community relations activities, as well as the company's media relations, employee communications, issues management, corporate branding, advertising and reputation management.  Defendant Davis either knew, was reckless, or was grossly negligent in not knowing that the Well was unsafe and Sempra lacked an appropriate contingency plan in the event of a leak at the Well.  Defendant Davis further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so. Davis is a citizen of California.

30.     Defendant Justin C. Bird ("Bird") is Sempra's Vice President, Compliance and Governance, and Corporate Secretary and has been since September 2014.  In this role, Bird directs the company's ethics and compliance programs worldwide and also acts as chief governance officer and corporate secretary. He oversees corporate governance and corporate structuring for the company and coordinates and records all meetings of the board of directors and its committees.  Defendant Bird has served in a variety of positions since joining Sempra in 2004.  Previously, Bird served as director of project finance for Sempra Energy, where he managed the successful $7.4 billion financing of Cameron LNG, the proposed liquefaction export terminal in Hackberry, La., as well as several other key company project financings. Prior to serving as the

11

director of project finance, Bird held positions as company counsel, senior counsel and principal counsel where he worked on a wide range of transactional matters for Sempra Energy and its subsidiaries. Prior to joining the company in 2004, he was an attorney at Latham & Watkins LLP, where he specialized in energy project development and finance. Bird holds a law degree from the University of Pennsylvania.  Defendant Bird either knew, was reckless, or was grossly negligent in not knowing that the Well was unsafe and Sempra lacked an appropriate contingency plan in the event of a leak at the Well.  Defendant Bird further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so.  Bird is a citizen of California.

31.     Defendant William C. Rusnack ("Rusnack") is a Sempra's Lead Director and has been since at least March 2007 and a director and has been since 2001. Defendant Rusnack is also a member of Sempra's Corporate Governance Committee and has been since at least March 2015.  Defendant Rusnack either knew or was reckless in not knowing that the Well was unsafe and Sempra lacked an appropriate contingency plan in the event of a leak at the Well.  Defendant Rusnack further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so. Rusnack is a citizen of California.

32.     Defendant William D. Jones ("Jones") is a Sempra director and has been since June 1998.  Defendant Jones is also the Chair of Sempra's Corporate Governance Committee; a member of that committee; and a member of the Audit Committee and has been since at least March 2015.  Defendant Jones either knew or was reckless in not knowing that the Well was unsafe and Sempra lacked an appropriate contingency plan in the event of a leak at the Well.  Defendant Jones further caused or allowed Sempra to fail to timely provide adequate temporary

housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so.  Jones is a citizen of California.

33.    Defendant William G. Ouchi ("Ouchi") is a Sempra director and has been since June 1998.  Defendant Ouchi is also a member of Sempra's Corporate Governance Committee and has been since at least March 2015.  Defendant Ouchi either knew or was reckless in not knowing that the Well was unsafe and Sempra lacked an appropriate contingency plan in the event of a leak at the Well. Defendant Ouchi further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so.  Ouchi is a citizen of California.

34.    Defendant James G. Brocksmith, Jr. ("Brocksmith") is a Sempra director and has been since October 2001.  Defendant Brocksmith is also a member of Sempra's Audit Committee and Environmental, Health, Safety and Technology Committee and has been since at least March 2015.  Defendant Brocksmith was Chair of the Audit Committee from at least March 2015 to at least May 2015.  Defendant Brocksmith either knew or was reckless in not knowing that the Well was unsafe and Sempra lacked an appropriate contingency plan in the event of a leak at the Well.  Defendant Brocksmith further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so.  Brocksmith is a citizen of Florida.

35.    Defendant William P. Rutledge ("Rutledge") is a Sempra director and has been since 2001.  Defendant Rutledge is also the Chair of Sempra's Environmental, Health, Safety and Technology Committee and a member of that committee and has been since at least March 2015.  Defendant Rutledge either knew or was reckless in not knowing that the Well was unsafe and Sempra lacked an appropriate contingency plan in the event of a leak at the Well.  Defendant

13

Rutledge further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so.  Rutledge is a citizen of California.

36.     Defendant Lynn Schenk ("Schenk") is a Sempra director and has been since March 2008.  Defendant Schenk is also a member of Sempra's Environmental, Health, Safety and Technology Committee and has been since at least March 2015. Defendant Schenk was a member of Sempra's Audit Committee from at least March 2015 to at least July 2015.  Defendant Schenk either knew or was reckless in not knowing that the Well was unsafe and Sempra lacked an appropriate contingency plan in the event of a leak at the Well. Defendant Schenk further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so. Defendant Schenk has also served in various positions in the cabinet of former California Governor Gray Davis, including Chief of Staff.  Schenk is a citizen of California.

37.     Defendant Alan L. Boeckmann ("Boeckmann") is a Sempra director and has been since February 2011.  Defendant Boeckmann is also a member of Sempra's Corporate Governance Committee and has been since at least March 2015.  Defendant Boeckmann either knew or was reckless in not knowing that the Well was unsafe and Sempra lacked an appropriate contingency plan in the event of a leak at the Well.  Defendant Boeckmann further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so. Boeckmann is a citizen of Nevada.

38.     Defendant Jack T. Taylor ("Taylor") is a Sempra director and has been since February 2013.  Defendant Taylor is also Chair of Sempra's Audit

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Committee and has been since at least July 2015; a member of that committee; and a member of the Environmental, Health, Safety and Technology Committee and has been since at least March 2015.  Defendant Taylor either knew or was reckless in not knowing that the Well was unsafe and Sempra lacked an appropriate contingency plan in the event of a leak at the Well.  Defendant Taylor further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so.

39.     Defendant James C. Yardley ("Yardley") is a Sempra director and has been since May 2013.  Defendant Yardley is also a member of Sempra's Audit Committee and Environmental, Health, Safety and Technology Committee and has been since March 2015.  Defendant Yardley either knew or was reckless in not knowing that the Well was unsafe and Sempra lacked an appropriate contingency plan in the event of a leak at the Well.  Defendant Yardley further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so.

40.     Defendant Kathleen L. Brown ("Brown") is a Sempra director and has been since June 2013.  Defendant Brown is also a member of Sempra's Corporate Governance Committee and Environmental, Health, Safety and Technology Committee and has been since at least March 2015.  Defendant Brown either knew or was reckless in not knowing that the Well was unsafe and Sempra lacked an appropriate contingency plan in the event of a leak at the Well. Defendant Brown further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so.  Brown is also the sister of California Governor Edmund Gerald "Jerry" Brown. Governor Brown's state agency, the State of California Division of Oil, Gas and

15

Geothermal Resources is named as a defendant in the negligence class action captioned *Cupial, et al. v. Southern California Gas Company, et al.*, Cal. Sup. Ct. No. BC604592. Governor Brown did not declare a state of emergency in the Aliso Canyon area due to the spill until January 6, 2016.  His lengthy delay in declaring an emergency was likely influenced by his familial relationship with Defendant Brown.  Brown is a citizen of California.

41.     Defendant Pablo A. Ferrero ("Ferrero") is a Sempra director and has been since November 2013.  Defendant Ferrero is also a member of Sempra's Audit Committee and Environmental, Health, Safety and Technology Committee and has been since at least March 2015.  Defendant Ferrero either knew or was reckless in not knowing that the Well was unsafe and Sempra lacked an appropriate contingency plan in the event of a leak at the Well.  Defendant Ferrero further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so.  Ferrero is a citizen of California.

42.     Defendant Luis M. Tellez was a Sempra director during a portion of the Relevant Time Period, serving as a director of the Company and member of the Company's Compensation and Corporate Governance Committees from September 2010 until May 31, 2015.  Tellez served as Mexico's Secretary of Energy from 1997 to 2000.  Tellez is a citizen of Mexico.

43.     Defendant Dennis V. Arriola ("Arriola") is a director of SoCalGas and has been its Chairman and CEO since March 2014 and its President since August 2012.  Defendant Arriola was also SoCalGas's Chief Operating Officer from August 2012 to February 2014. From 2008 to 2012, Arriola served as executive vice president and chief financial officer for SunPower Corp., a Silicon Valley-based solar panel manufacturer. From 2006 to 2008, he was senior vice president and chief financial officer of both SDG&E and SoCalGas. Previously,

16

Arriola also served as vice president of communications and investor relations for Sempra Energy and regional vice president and general manager of Sempra's South American operations. He first joined the company in 1994 as treasurer for Pacific Enterprises/SoCalGas.  Defendant Arriola either knew, was reckless, or was grossly negligent in not knowing that the Well was unsafe and Sempra lacked an appropriate contingency plan in the event of a leak at the Well.  Defendant Arriola further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so.  Arriola is a citizen of California.

44.     Defendant Jimmie I. Cho ("Cho") is SoCalGas's Senior Vice President, Gas Operations and System Integrity, and has been since at least June 2014. Cho is responsible for gas operations and engineering, which includes gas distribution, system integrity and major projects. Cho holds a bachelor's degree in geology from Brown University and a master's degree in civil engineering from Stanford University. Defendant Cho either knew, was reckless, or was grossly negligent in not knowing that the Well was unsafe and Sempra lacked an appropriate contingency plan in the event of a leak at the Well.  Defendant Cho further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so.  Cho is a citizen of California.

45.     Defendant Doug Schneider ("D. Schneider") is SoCalGas's Vice President, Engineering and System Integrity, and has been since at least February 2014. Defendant D. Schneider either knew, was reckless, or was grossly negligent in not knowing that the Well was unsafe and Sempra lacked an appropriate contingency plan in the event of a leak at the Well.  Defendant D. Schneider further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the

17

Health Department instructing Sempra to do so.  D. Schneider is a citizen of California.

46.     Defendant Michael M. Schneider ("M. Schneider") is SoCalGas's Vice President, Operations Support and Chief Environmental Officer, and has been since at least February 2014.  Defendant M. Schneider either knew, was reckless, or was grossly negligent in not knowing that the Well was unsafe and Sempra lacked an appropriate contingency plan in the event of a leak at the Well. Defendant M. Schneider further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so. M. Schneider is a citizen of California.

47.     Defendant Scott Furgerson ("Furgerson") is SoCalGas's Vice President, Gas Operations, and has been since at least June 2014.  Defendant Furgerson either knew, was reckless, or was grossly negligent in not knowing that the Well was unsafe and Sempra lacked an appropriate contingency plan in the event of a leak at the Well.  Defendant Furgerson further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so.  Furgerson is a citizen of California.

48.     Defendant George Minter ("Minter") is SoCalGas's Regional Vice President, External Affairs and Environmental Strategy, and has been since at least February 2015.  Defendant Minter either knew, was reckless, or was grossly negligent in not knowing that the Well was unsafe and Sempra lacked an appropriate contingency plan in the event of a leak at the Well.  Defendant Minter further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so.  Minter is a citizen of California.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1    49.    Defendant J. Bret Lane ("Lane") is a director of SoCalGas as well as

2  its Chief Operating Officer.  According to the Company's website:  "Prior to

3  becoming COO, Lane served as senior vice president of gas operations and

4  system integrity for SoCalGas, responsible for all aspects of gas delivery services,

5  including region operations, engineering, transmission, storage and pipeline

6  safety. Lane has held several senior-level positions with SoCalGas, including vice

7  president of gas operations and system integrity; vice president of gas

8  transmission and distribution; vice president of field services; vice president of

9  environmental, safety and facilities; vice president of labor relations and was

10  chief environmental officer. Lane has held leadership positions in field operations

11  and various staff functions including human resources, environmental services

12  and gas supply. He joined the company's transmission and storage operations

13  division in 1982."  Lane is a citizen of California.

14    50.    Defendant Martha B. Wyrsch ("Wyrsch") is Executive Vice

15  President and General Counsel for Sempra Energy.  As executive vice president

16  and general counsel, Wyrsch oversees all Sempra Energy's legal affairs. She is

17  also a director of SoCalGas.

18    51.    Defendant Jesse J. Knight, Jr. ("Knight") was a director of SoCalGas

19  during the Relevant Time Period, serving as Chairman of the Board from 2014

20  until November 1, 2015.  From 1993 to 1999, Knight served as commissioner for

21  the California Public Utilities Commission, after being appointed by then-

22  Governor Pete Wilson.  Knight also served as Executive Vice President of

23  external affairs for Sempra Energy from 2006 until November 1, 2015.  Knight is

24  a citizen of California.

25    52.    The defendants identified in ¶¶ 27-30 are referred to herein as the

26  "Officer Defendants."  The defendants identified in ¶¶ 27, 31-43, and 50-51 are

27  referred to herein as the "Director Defendants."  Collectively, the Officer

28  Defendants and the Director Defendants are referred to herein as the "Individual

19

1    Defendants."

2        53.    The true names and capacities of defendants sued herein as Does 1

3    through 25, inclusive, are presently not known to plaintiff, who therefore sues

4    these defendants by such fictitious names.  Plaintiff will seek to amend this

5    Complaint and include these Doe defendants' true names and capacities when

6    they are ascertained.  Each of the fictitiously named defendants is responsible in

7    some manner for the conduct alleged herein and for the injuries suffered by the

8    Company as a result of defendants' wanton and illegal conduct.

9                    **DUTIES OF THE INDIVIDUAL DEFENDANTS**

10   **Fiduciary Duties**

11       54.    By reason of their positions as officers and directors of Sempra and

12   SoCalGas, each of the Individual Defendants owed and owe the Company and its

13   stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and

14   were and are required to use their utmost ability to control and manage Sempra

15   and SoCalGas in a fair, just, honest, and equitable manner.  The Individual

16   Defendants were and are required to act in furtherance of the best interests of the

17   Company and not in furtherance of their personal interest or benefit.

18       55.    SoCalGas is owned and controlled by Sempra.  By reason of their

19   positions as officers and directors of SoCalGas, each of the SoCalGas Individual

20   Defendants owed and owe SoCalGas fiduciary obligations of trust, loyalty, good

21   faith, and due care, and were and are required to use their utmost ability to control

22   and manage SoCalGas in a fair, just, honest, and equitable manner.  The

23   SoCalGas Individual Defendants were and are required to act in a manner so as

24   not to cause harm to SoCalGas and Sempra and not in furtherance of their

25   personal interest or benefit.

26       56.    To discharge their duties, the officers and directors of the Company

27   were required to exercise reasonable and prudent supervision over the

28   management, policies, practices, and controls of the financial affairs of Sempra

and SoCalGas, respectively.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

    a.    ensure that the Company complied with their legal obligations and requirements, including complying with all state and federal laws concerning natural gas storage and leak response;

    b.    conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of their businesses, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

    c.    remain informed as to how Sempra and/or SoCalGas conducted operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Additional Duties of the Environmental, Health, Safety, and Technology Committee**

57.    In addition to the above duties, under its Charter, in effect since 2000, the Environmental, Health, Safety and Technology Committee Defendants, defendants Brocksmith, Rutledge, Schenk, Taylor, Yardley, Brown, and Ferrero owed specific duties to Sempra to assist the Board in overseeing "the Company's programs and performance related to environmental, health, safety and technology matters."  The Charter further states that the Environmental, Health, Safety, and Technology Committee is responsible for reviewing "environmental, health and safety laws, regulations and developments at the global, national, regional and local level and evaluation of ways to address these matters as part of Sempra's business strategy and operations." Moreover, the Charter specifically acknowledges that:

The Company's operational performance can affect the environment as well as the health and safety of employees and other stakeholders in the communities we serve and beyond.  Consequently this Committee's focus on environmental, health, safety and technology

21

issues is consistent with the board's oversight role of corporate responsibility and stewardship.

58.     On November 9, 2015 (approximately two weeks after the leak had started), the Charter of the committee was amended.  The amendments included additional responsibilities for the committee, which is now responsible for "monitor[ing] compliance with internal policies and goals as well as applicable external laws and regulations."

59.     Another new provision of the updated Environmental, Health, Safety and Technology Committee Charter states:

> The Company's operational performance can affect the environment as well as the health and safety of employees and other stakeholders in the communities we serve and beyond. Consequently this Committee's focus on environmental, health, safety and technology issues is consistent with the board's oversight role of corporate responsibility and stewardship.

60.     The members of the Environmental, Health, Safety and Technology Committee, defendants Rutledge (chair), Brocksmith, Brown, Ferrero, Schenk, Taylor, and Yardley, have additional specific duties to Sempra to oversee environmental, health, safety, and technological matters.

**Additional Duties of the Audit Committee**

61.     Under its Charter, in effect since December 2, 2003, the Audit Committee Defendants, defendants Jones, Brocksmith, Schenk, Taylor, Yardley, and Ferrero owed additional specific duties to Sempra to ensure its "compliance with legal and regulatory requirements."

**Breaches of Duties**

62.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Sempra, the absence of good faith on their part, and a reckless disregard for their duties to Sempra that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to Sempra.

22

63.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, Sempra to: (i) underspend on safety and remediation issues at the Aliso Canyon well; (ii) make misrepresentations regarding the Company's safety measures, internal controls, and safety of the Company's natural gas wells and pipelines; (iii) fail to timely notify the proper authorities after discovering the Well leak; (iv) fail to install a safety valve on the Well; (v) continuously pollute the air and ground water; (vi) expose thousands of local residents to toxic gases and harmful chemicals; and (vii) fail to timely provide affected residents with adequate temporary housing.  These breaches of fiduciary duties constituted bad faith, a breach of the defendants' fiduciary duty of loyalty to the Company, and conduct which has caused Sempra to incur substantial damages.

64.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Sempra, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage Sempra has already incurred, Sempra has expended, and will continue to expend, significant sums of money.

## SUBSTANTIVE ALLEGATIONS

### A.    The Board's Direct Responsibility for the Misconduct Alleged Herein

65.     Sempra Energy develops and operates energy infrastructure and provides gas and electricity services to its customers in North and South America.

66.     Sempra's Board of Directors has ultimate authority for all its operations.  Moreover, as admitted by the Company in its Proxy Statement, in addition to its general oversight role, the Company's Board of Directors performs a number of specific functions, including:

a.     Selecting the Company's Chief Executive Officer and overseeing his

23

or her performance and that of other senior management in the operation of the company;

b.  Reviewing and monitoring strategic, financial and operating plans and budgets and their development and implementation by management;

c.  Assessing and monitoring risks and risk-management strategies;

d.  Reviewing and approving significant corporate actions; and

e.  Reviewing and monitoring processes designed to maintain the company's integrity, including financial reporting, compliance with legal and regulatory obligations, and relationships with shareholders, employees, customers, suppliers and others.

*See* Sempra's Proxy Statement filed with the SEC on March 25, 2016, at p. 10.

67.   As will be demonstrated below, in conformance with the specific duties set forth above pertaining to the Board, ***the key events in this case were directly reviewed and approved by the Board of Directors of Sempra and SoCalGas***.

68.   Moreover, the Board had direct responsibility for risk oversight during the Relevant Period.  As the Company has acknowledged in at least its last two annual Proxy Statements:

"The board has developed an integrated risk management framework to assess, prioritize, manage and monitor risks across the company's operations. ***Sempra's full board has ultimate responsibility for risk oversight under this framework. Consistent with this approach, our corporate governance guidelines provide that the specific functions of the Board of Directors include assessing and monitoring risks and risk management strategies.***"

"The board believes that risk stretches far beyond any one committee. As a result, the board has diversified its risk oversight responsibilities across its membership, housing categories of risk oversight within board committees by topic. Any risk oversight that does not fall within a particular committee remains with the full board."

"***The board reviews and monitors strategic, financial and operating plans that are intended to provide sustainable long-term growth with what it deems to be an acceptable level of risk***. Each of our

24

business units is responsible for identifying and moderating risk in a manner consistent with these goals. ***The board fulfills its risk oversight function through receipt of reports provided both directly to the board and to appropriate board committees. Based on these reports, the board or appropriate committees establish or amend existing risk oversight and control mechanisms. In addition, the company has a robust internal audit function that reports directly to the Audit Committee***."

69.     During the Relevant Period, however, the Board of Directors of Sempra and SoCalGas intentionally pursued costs saving measures that did not entail an acceptable level of risk, intentionally <u>declined</u> to adopt state-of-the-art risk assessment and remediation plans for the Company's natural gas wells (at the same time the Company adopted and implemented such plans for the Company's natural gas transmission pipelines), and left the Aliso Canyon well vulnerable to a leak of epic proportions that would financially devastate the Company.

70.     Indeed, public news reports have widely reported the risks to natural gas wells from fracking over the last decade.  For example, on January 21, 2016 the *Sacramento Bee* reported that a recent California Council on Science and Technology report found that "'Hydraulic fracturing facilitates about a third of the  subsurface storage of natural gas in "the state,' and is especially common in Aliso Canyon … .  Operators frack storage wells to increase gas production, which decreases by about 5 percent a year, according to a U.S. Department of Energy report." Furthermore, because "natural gas is often stored in depleted oil wells built more than 60 years ago … . [that] were not designed to handle the extremely high pressure of fracking" a disaster of this kind was not unpredictable. The wells used in California "are often corroded, making them susceptible to damage caused by acids and other chemicals injected at high pressures."

**B.      Defendants Knew That Sempra and Its Subsidiary Utilities Operate in a Highly Regulated Field, Subject to Intense Governmental Oversight**

71.     The Defendants, highly paid officers and directors of Sempra, were acutely aware during the Relevant Period that Sempra and its utility subsidiaries,

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

including SoCalGas and San Diego Gas & Electric, are highly regulated entities due to the fact that their primary customers are consumers whose health, welfare, and safety are affected by the Company's provision of gas and electric to consumers' homes.

72. Indeed, Sempra's Annual Reports consistently noted during the Relevant Period that the Company is regulated by a host of federal, state, and international governmental regulators. For example, as Sempra's most recent Annual Report filed February 26, 2016 notes, the Company is regulated by:

a. The California Public Utilities Commission (CPUC), the California Energy Commission (CEC) and the California Air Resources Board (CARB);

b. The Federal Energy Regulatory Commission (FERC),[5] the Nuclear Regulatory Commission (NRC) and the U.S. Department of Transportation (DOT);

c. In addition to regulation by the FERC, SoCalGas' natural gas storage facilities are regulated by the California Department of Conservation's Division of Oil, Gas, and Geothermal Resources (DOGGR), the CPUC, the CARB, and various other state and local agencies;

d. The South Coast Air Quality Management District (SCAQMD) is the air pollution control agency responsible for regulating stationary sources of air pollution in the South Coast Air Basin in Southern California. The district's territory covers all of Orange County and the urban portions of Los Angeles, San Bernardino and Riverside counties;

e. The California Utilities obtain numerous permits, authorizations and licenses in connection with the transmission and distribution of natural gas and electricity and the operation and construction of related assets, including electric generation and natural gas storage facilities, some of which may require periodic renewal.

---

[5] In the case of SoCalGas, the FERC regulates the interstate sale and transportation of natural gas and the uniform systems of accounts.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**C.    The Aliso Canyon Well and Defendants' Intentional Decision to Relegate Well Safety (as Opposed to Pipeline Safety) to Stepchild Status**

73.    Sempra's well at Aliso Canyon is the largest natural gas storage reservoir in California and one of the largest reservoirs in the United States.  The well is located approximately one mile from the community of Porter Ranch and its 30,000 residents, and within a few miles of the residential communities of Chatsworth, Granada Hills, and Northridge.

74.    Beginning at least in 2010, the Individual Defendants approved operating plans for the Company that intentionally de-emphasized the safety of SoCalGas' natural gas storage wells and underfunded necessary maintenance of and capital improvements to natural gas wells, and instead prioritized only gas transmission pipelines.

75.    In California, gas storage wells are regulated through the state's underground injection control (UIC) program (*see* Title 14, Code of California Regulations, §§1724.6 - 1724.10, (14 CCR §§1724.6 - 1724.10)).  The principal regulation specific to gas storage wells is 14 CCR §1724.8.

76.    The Aliso Canyon well is actually a collection of approximately 116 underground wells, with each having an average depth of 8,500 feet.  The leaking well is referred to as Standard Sesnon-25, or "SS-25", API03700776.  Forty-eight of the wells, including the leaking well SS-25, are over 60 years old.

77.    The wells were originally drilled as oil wells after oil was discovered at Aliso Canyon in 1938.  Thereafter,  J. Paul Getty's Tidewater Associated Oil Company produced oil and gas until the Sesnon-Frew reservoir, the largest reservoir within the oil field, was depleted in the early 1970s. On December 18, 1968, a blowout and fire destroyed equipment but caused no injuries when an operator attempted to remove two gas-lift valves at one of the wells. Getty sold his portion of the field to Pacific Lighting Company, a gas company, which repurposed it to gas storage in 1972. As opposed to current practice, older wells

27

1   were not sealed to the surrounding rock formation, including their often more
2   than one mile of steel casing.

3       78.   The Aliso Canyon well is the largest of the Company's four
4   underground natural gas storage facilities.  The characteristics of the four wells
5   are as follows:

### Southern California Gas Company
Descriptive Statistics of Gas Storage Fields

| Descriptive Statistic | Aliso Canyon | La Goleta | Honor Rancho | Playa del Rey | Total All Fields |
|---|---|---|---|---|---|
| Year Field Placed in Service | 1973 | 1941 | 1975 | 1942 | - |
| Injection/Withdrawal/Observation Wells | 115 | 20 | 40 | 54 | 229 |
| Gas Compressor Units (number) | 8 | 8 | 5 | 3 | 24 |
| Compression Horsepower (bhp) | 42,000 | 5,700 | 27,500 | 6,000 | 81,000 |
| Maximum Reservoir Pressure (psig) | 3,600 | 2,050 | 4,400 | 1,700 | - |
| Working Gas (Bcf) | 86.2 | 21.5 | 26.0 | 2.4 | 136.1 |
| Maximum Withdrawal Rate (MMcfd) | 1,860 | 420 | 1,000 | 400 | 3,760 |
| Maximum Injection Rate (MMcfd) | 600 | 140 | 300 | 75 | 1,115 |
| Maximum Well Depth (feet) | 10,691 | 6,912 | 13,300 | 6,575 | - |
| Minimum Well Depth (feet) | 6,997 | 4,247 | 9,165 | 6,049 | - |
| Average  Well Depth (feet) | 8,146 | 4,886 | 9,959 | 6,339 | - |

16   79.   Today, cement from the surface of the ground to the bottom of the
17  SS-25 well makes the casings stronger and protects them from water.  The Aliso
18  Canyon natural gas storage facility contains 115 wells tapping a reservoir that
19  holds up to 86 billion cubic feet of natural gas for distribution to residences,
20  businesses, and electric utilities in the L.A. basin.  The field is the second largest
21  storage facility of its kind in the United States.

22      80.   The gas at the Aliso Canyon Well is not from the region.  Rather,
23  Sempra injects and stores the gas underground at the Well.  The gas injected in
24  the Well is comprised of methane along with numerous additional toxic gases,
25  including toluene, benzene, hydrogen sulfides, sulfur dioxide, ethylbenzene, and
26  xylenes.  These toxic gases pose significant threats to the environment and to
27  anyone exposed to the gases.  Methane, when released into the air, absorbs the

28

sun's heat and traps it in the earth's atmosphere, and is a far more destructive greenhouse gas than others, such as carbon dioxide.  Exposure to elevated levels of toluene can cause acute and chronic damage to the central nervous system; symptoms include fatigue, sleepiness, headaches, and nausea.  Benzene is categorized by the U.S. Environmental Protection Agency as a carcinogen and exposure can cause drowsiness, dizziness, and headaches, as well as eye, skin, and respiratory tract irritation with acute exposure, and blood disorders can be caused by long term exposure.

81.    In September 2015, SoCalGas injected 5.7 billion cubic feet of these gases underground near the residents of Porter Ranch.  In October 2015, SoCalGas was injecting what is believed to be similar amounts of gas when workers discovered the leak.

82.    Southern California Gas Company has stated that the leak in well SS-25 was discovered on October 23, 2015 during one of its twice-daily well observations.[6]  Residents of the nearby upscale Porter Ranch neighborhood reported what they thought was a home with a major gas leak on October 23, 2015. SoCal Gas "went from home to home to home, giving everybody the A-OK and [...] didn't admit to having a gas leak until [...] probably around the 28th of October."[7]

83.    Thus, despite the fact that Sempra internally confirmed the leak on October 23, 2015, *the Director Defendants caused Sempra to delay by at least*

---

[6] *See Herman K. Trabish, Dec. 21, 2015, "Historic Los Angeles Methane Leak Puts Natural Gas Emissions Under Scrutiny,"* UTILITY DIVE (INDUSTRY DIVE), available at http://www.utilitydive.com/news/historic-los-angeles-methane-leak-puts-natural-gas-emissions-under-scrutiny/411060/, last visited Mar. 25, 2016.

[7] *See also* Amy Goodman, "Erin Brockovich: California Methane Gas Leak is Worst U.S. Environmental Disaster Since BP Oil Spill," DEMOCRACY NOW, Dec. 30, 2015, available at http://www.democracynow.org/2015/ 12/30/erin_ brockovich_california_methane_gas_leak, last visited Mar. 25, 2016.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

*five days notifying the authorities of the leak*, in direct contravention of the law, which required Sempra to report the leak immediately.  And, as noted above, for several days after discovering the leak, Sempra denied the leak to local residents, and even went house-to-house informing them that everything was fine.

84.     Local residents immediately began reporting headaches, nausea, and severe nosebleeds.  About 50 children per day saw school nurses for severe nosebleeds. Local residents have also experienced neurological, gastrointestinal, and respiratory ailments, dizziness, and vomiting.  In light of the health risks to local residents, on November 19, 2015, the Health Department ordered Sempra to expedite leak abatement and to provide free, temporary relocation to any residents affected by the gas leak.  Weeks later, and more than one month after SoCalGas crews stated they discovered the leak, on December 4, 2015, Sempra finally began the slow process of constructing the relief well.

85.     Initial reports suggested that Sempra's first attempts to stop the well from spewing gases failed because the Well's safety valve had failed.  As weeks went by, further efforts to stop the leak failed.  On December 15, 2015, Rodger Schwecke ("Schwecke"), a SoCalGas executive who was helping to coordinate the response to the leak, was asked by reporters about the safety valve. Shockingly, Schwecke admitted that the safety valve was not damaged; it actually was removed in 1979.  According to Schwecke, in 1979, the valve was old and leaking, and Sempra opted to remove instead of repair the valve because it was difficult to find a new part.  This admission came nearly five years after SoCalGas requested and obtained regulatory permission to increase rates to replace the many leaking valves at the Aliso Canyon storage field.  Despite the ratepayer increase and annual profits of nearly $100 million, SoCalGas never installed a new safety valve.  The Director Defendants were aware of this decision and approved the decision not to replace the safety valve.

86.     Moreover, according to the California Legislature, the Individual

30

1   Defendants were aware of increasing well integrity problems at Aliso Canyon and

2   had proposed a still-pending-before-the-Commission Storage Integrity

3   Management Program (SIMP) for implementation as of October 2015.

4   Notwithstanding, however, the Individual Defendants' knowledge of the

5   increasing well integrity problems at Aliso Canyon, ***the leaking well SS-25 was***

6   ***not one of those designated for the program***.  The 18 wells proposed for SIMP

7   were all originally drilled from 1943 - 1955 and later converted in the 1970s to

8   gas storage wells.  *See* Bill Analysis, Bill No. SB887, California Senate

9   Committee on Natural Resources and Water, Mar. 28, 2016.

10        87.    The decision not to replace the safety valve at Aliso Canyon, and not

11   to include SS-25 in the proposed SIMP, was a conscious decision made by the

12   Director Defendants to put profits over safety.

13        88.    Moreover, the Individual Defendants' knowledge of the needed

14   repairs to the Aliso Canyon Well is demonstrated by the presentation that

15   SoCalGas made to the CPUC in November 2014 regarding the proposed SIMP

16   and recommended Operations and Maintenance expenses and capital

17   improvements to SoCalGas's underground natural gas storage wells, including

18   those at Aliso Canyon.  In remarks prepared by Phillip E. Baker, Director of Gas

19   Distribution at SoCalGas, the Company admitted the substantial capital

20   improvements needed at the Aliso Canyon underground wells, stating:

> "By their nature, gas storage fields occupy large open areas of land
> and require the continual installation, maintenance, refurbishment,
> and replacement of heavy industrial equipment such as engines,
> compressors, electrical systems, wells and piping, gas processing
> components, and instrumentation."[8]

---

[8]   *See* SoCalGas, Direct Testimony of Phillip E. Baker Before the CPUC, November 2014, available at https://www.socalgas.com/regulatory/documents/a-14-11-004/SCG-06_P__Baker_Testimony.pdf, last visited April 2, 2016.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

89.     Indeed, as part of its presentation in November 2014 to the CPUC regarding necessary improvements at Aliso Canyon, Sempra candidly admitted that it had not spent the same resources on well safety as it had on gas transmission pipelines:

> "Historically, safety and risk considerations for wells and their associated valves and piping components have not been addressed in past rate cases to the same extent that distribution and transmission facilities have been under the Distribution and Transmission integrity management programs."[9]

90.     The November 2014 presentation was made by Phillip Baker, who was Director of Storage for SoCalGas, "responsible for maintaining the integrity of the [natural gas] storage system to ensure a safe, reliable supply of natural gas for customers throughout the SoCalGas and SDG&E service territory."[10]

91.     Underscoring the material defects in the Company's approach to underground gas wells, the Company's November 2014 presentation to CPUC admitted that "Currently, risk assessment of our storage system is of a qualitative nature" and stated:  "The future of risk assessment for our storage system is moving towards a more robust and quantitative approach that will help us capture more information on the condition of our storage wells and develop models that will assist in prioritizing risk mitigation activities."[11]  In his remarks to the CPUC, Phillip Baker also highlighted SoCalGas' disparate treatment of underground gas wells compared to gas transmission pipelines, stating "***we believe it is critical that we adopt a more proactive and in-depth approach.  Historically, safety and risk considerations for wells and their associated valves and piping components have not been addressed in past rate cases to the same extent that distribution***

---

[9]     *Id*. at p. PEB-5.
[10]    *Id*. at p. PEB-55.
[11]    *Id*. at p. PEB-6.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

***and transmission facilities have been*** under the Distribution and Transmission integrity management programs."[12]

92.     In other words, SoCalGas and Sempra were fully aware of and had approved at all relevant times a bifurcated approach to natural gas safety, pursuant to which well safety had been intentionally relegated to an inferior stepchild status, with well safety only being "qualitatively" and informally analyzed, contrasted with the "state of the art" objective and scientific analysis performed on gas pipeline safety and remediation.  As Baker noted, "Risk management activities, processes, and procedures for well integrity should have a focus similar to those employed under the Company's pipeline risk mitigation programs."[13]

93.     As Baker presciently forecasted:  "Without a robust program to inspect underground storage wells to identify potential safety and/or integrity issues, problems may remain undetected within the high pressure above-ground wellheads, pipe laterals (up to 3,600 psig) and below-ground facilities (up to 4,400 psig) among the 229 storage field wells.  This situation is evidenced by an increase in recent years in the type of work related to safety conditions observed as part of routine operations.  This concern is further amplified by the age, length, and location of wells.  Some SoCalGas wells are more than 80 years old with an average age of 52 years.  Well depths can exceed 13,000 feet.  In addition, some wells are located within close proximity to residential dwellings or high consequence areas."[14]

94.     Indeed, Baker told the CPUC in his written report and in his comments that major problems at SoCalGas' wells had developed, and were in

---

[12]     *Id.* at p. PEB-5.
[13]     *Id.* at p. PEB-5 to PEB-6.
[14]     *Id.* at p. PEB-17.

33

fact a trend, stating:  "In fact, a negative well integrity trend seems to have developed since 2008."  To emphasize the point, Baker included the following chart in his presentation:

**Table PEB-8**
**Southern California Gas Company**
**Number of Major Well Integrity Workovers by Year**

| Well Integrity Category | Year | | | | | |
|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Casing Leak | - | - | - | 2 | 3 | 2 |
| Tubing Leak | 1 | 1 | 5 | 3 | 3 | 4 |
| Wellhead Leak | - | - | 1 | 2 | - | 2 |
| Casing Shoe Leak | - | 1 | - | 1 | - | - |
| Sub-surface Safety Valve | 2 | - | - | - | 2 | 1 |
| Total | 3 | 2 | 6 | 8 | 8 | 9 |

95.     SoCalGas' November 2014 presentation to the CPUC also admitted that "Ultrasonic surveys conducted in storage wells as part of well repair work from 2008 to 2013 identified internal/external casing corrosion, or mechanical damage in 15 wells. External casing corrosion has been observed at relatively shallow depths in the production casing, and at deeper intervals near the Aliso Canyon shallow oil production zone at which is being water flooded. Internal mechanical wear has been observed in production casings, likely as a result of drilling operations that took place when the well was originally drilled. In addition, external tubing corrosion has been observed on tubing in the joint above the packer most likely as a result of stagnant fluid. In addition to the 36 well-related conditions presented in Table 8, and the corrosion or mechanically damaged wells that were previously identified, SoCalGas has 52 storage wells in service that are more than 70 years old. Half of the 229 storage wells are more than 57 years old as of July 2014. Figure PEB-5 below displays the age distribution visually."

///

///

///

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**Figure PEB-5**
**Southern California Gas Company**
**Age Distribution of Storage Wells**



96.     Given these sobering facts, Baker concluded by noting: "Given the increasing trend in well integrity repairs, the corrosion threats that have been detected on some wells, the increasing age of the wells, and the success of the California Public Utilities Commission (CPUC)-approved TIMP, which has been established to maintain the safety of horizontal high pressure pipelines that are subject to less harsh conditions than storage wells, the SIMP is certainly justified. Without the SIMP, SoCalGas will continue to operate in a reactive mode (with the potential for even higher costs to ratepayers) to address sudden failures of old equipment. In addition, SoCalGas and customers could experience major failures and service interruptions from potential hazards that currently remain undetected."[15]

---

[15]     *Id.* at p. PEB-18 to PEB-19.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

97.     Baker's November 2014 presentation was also based in part on material from Defendant D. Schneider and non-defendant Diana Day, and the proposals and ultimate decisions were reviewed and approved by the Board of Directors of SoCalGas and Sempra.

98.     It is important to note that the Storage Integrity Management Plan (SIMP) *proposed*[16] by SoCalGas in November 2014 to the CPUC was the first time SoCalGas had ever proposed or implemented a formal plan to mitigate safety-related risks relating to the Company's underground natural gas storage wells.  This was clearly deficient and reckless in light of the importance of the wells to SoCalGas and Sempra and the risks that the aging wells posed to the public and environment.

99.     Moreover, even under the SIMP proposed by SoCalGas in November 2014, no funding was proposed to address the material deficiencies in SS-25.  In fact, the entire SIMP budget for underground storage wells was only $5.676 million in O&M (operations and management) costs and $24.272 million in capital improvements per year for six years.

100.    The Company's decision to not spend the necessary money to improve SS-25 has proved disastrous for the Company, for local residents of Porter Ranch, and for the environment, as the Aliso gas leak carbon footprint is said to be larger than the Deepwater Horizon leak in the Gulf of Mexico.

101.    On March 8, 2016, the California Air Resources Board released the following updated preliminary data regarding the extent of the natural gas released due to the leak:

///

///

///

---

[16]     The SIMP was never implemented.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| Date of Flight | Leak Rate Measured [kilogram methane per hour] | Expected Error in Measurement [kilogram methane per hour] | Assumed number of days at this leak rate | Estimate of leaked methane for this period* [kilogram methane] | Very Rough Estimate of Cumulative Leak** [billion cubic feet of natural gas, bcf] | Very Rough Estimate of Cumulative Leak***[MMTCO₂e] |
|---|---|---|---|---|---|---|
| Nov 7th | 44,000 | ±5,000 | 17 | 17 | 1.0 | 0.4 |
| Nov 10th | 50,000 | ±16,000 | 11 | 13 | 1.8 | 0.8 |
| Nov 28th | 58,000 | ±12,000 | 12 | 16 | 2.7 | 1.2 |
| Dec 4th | 43,000 | ±5,400 | 7 | 7,224,000 | 3.2 | 1.4 |
| Dec 12th | 36,000 | ±6,800 | 9 | 7,776,000 | 3.6 | 1.6 |
| Dec 23rd | 30,300 | ±6,100 | 14 | 10 | 4.2 | 1.8 |
| Jan 8th, 2016 | 23,400 | ±4,600 | 10 | 5,616,000 | 4.5 | 2.0 |
| Jan 12th | 21,500 | ±4,300 | 7 | 3,612,000 | 4.7 | 2.1 |
| Jan 21st | 19,600 | ±3,700 | 6 | 2,822,400 | 4.9 | 2.1 |
| Jan 26th | 20,700 | ±4,100 | 8 | 3,974,400 | 5.1 | 2.2 |
| Feb 4th | 20,600 | ±5,000 | 11 | 5,438,400 | 5.4 | 2.4 |

    *   This assumes a constant leak rate since the last measurement, 94,500,000.
    **  Assumes natural gas from the leak is 94% methane, and methane has density of 0.01858 kg/cu-ft.
    *** Using the 100 year global warming potential for methane of 25 from the date of the leak through the day of the flight.

102.   Commensurate with the Health Department's November 19, 2015 order, thousands of local residents have requested that Sempra provide temporary relocation due to the Well leak.  Sempra, however, has failed to timely and adequately provide the housing.  Indeed, numerous complaints have been filed against Sempra alleging that it has failed to provide timely housing and/or failed to provide adequate housing for residents with disabilities and/or pets.  The Los Angeles City Attorney also filed an *ex parte* application for a temporary restraining order on December 22, 2015, seeking to compel Sempra to improve its relocation process.  In its application, the City Attorney described numerous examples in which Sempra failed to: (i) provide timely relocation; (ii) provide suitable alternative housing; (iii) properly accommodate persons with disabilities; and/or (iv) properly accommodate persons and families with pets.

103.   On January 6, 2016, Sempra and SoCalGas filed a joint Current Report on Form 8-K with the SEC.  The Form 8-K disclosed that as of January 3, 2016, approximately 2,500 households have been temporarily relocated.  The Form 8-K further admitted that at least 1,460 households had requested temporary relocation but that those requests had not yet been fulfilled by Sempra.

///

///

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**D.    The Board Was Intimately Aware that the Well Posed Substantial Risks to the Environment and Surrounding Communities**

104.    The Board is responsible for risk oversight at Sempra, including risk management of natural gas storage and transmission.  As stated in Sempra's Corporate Governance Guidelines, as adopted by the Board, the Board is responsible for "[a]ssessing and monitoring risks and risk management strategies."  In fact, ***each Board member is required to "[d]evelop and maintain a broad understanding of [Sempra's] business and risk profile ... including environmental, and health and safety systems and procedures."***

105.    The Company's Annual Reports on Form 10-K highlight the most significant risks the Company faces, including relating to the significant threats posed by the storage of natural gas in close proximity to populated communities.  Specifically, all Sempra's Annual Reports since at least 2011, which were signed by each Board member at the time of their filing, have admitted that the Company's natural gas storage wells are dangerous and pose significant risks to the environment and to the local communities, and that well failures could cost the Company a tremendous amount of money.  For example, each Form 10-K states that Sempra is "in the business of using, storing, transporting and disposing of highly flammable and explosive materials" and that "the risks ... to [Sempra's] facilities and infrastructure, as well as the risks to the surrounding communities are substantially greater than ... a typical business."  Moreover, the Annual Reports repeatedly note that any accidents at Sempra's facilities, including at the Company's natural gas storage facilities, could cause "catastrophic" damage to the environment, as well as personal injuries and fatalities, and "could have a material adverse effect on Sempra's businesses, financial condition, results of

///

///

///

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

operations, cash flows and/or prospects."[17]  The Board has also repeatedly

acknowledged in Forms 10-K that Sempra could face penalties to the California

Public Utilities Commission of up to $50,000 per day per natural gas safety

violation.  Sempra's 2014 Annual Report, filed with the SEC on February 26,

2015, emphasized the materiality of these stringent safety requirements and the

fines the Company could face for noncompliance:

> "In December 2011, the CPUC adopted a natural gas safety citation
> program whereby natural gas distribution companies can be fined by
> CPUC staff for violations of the CPUC's safety standards or federal
> standards. Each day of an ongoing violation may be counted as an
> additional offense. The maximum penalty is $50,000 per offense. In
> September 2013, the CPUC issued Standard Operating Procedures
> setting forth its principles and management process for the gas safety
> citation program."

106.   The Company's 2014 Annual Report was reviewed, approved, and

signed by Defendants Tellez, Reed, Householder, Boeckmann, Brocksmith,

Brown, Ferrero, Jones, Ouchi, Rusnick, Rutledge, Schenk, Taylor, and Yardley,

on behalf of Sempra, and by Defendants Arriola, Householder, Lane, and Wyrsch

on behalf of SoCalGas.

107.   Furthermore, the 2014 Annual Report advised Sempra shareholders

---

[17]   The 2011 Annual Report was reviewed, approved, and signed by Director Defendants Boeckmann, Brocksmith, Jones, Ouchi, Rusnack, Rutledge, and Schenk; the 2012 Annual Report was reviewed, approved, and signed by Director Defendants Reed, Boeckmann, Brocksmith, Jones, Ouchi, Rusnack, Rutledge, and Schenk; the 2013 Annual Report was reviewed, approved, and signed by Director Defendants Reed, Boeckmann, Brocksmith, Jones, Ouchi, Rusnack, Rutledge, Schenk, and Taylor; the 2014 Annual Report was reviewed, approved, and signed by Director Defendants Reed, Boeckmann, Brocksmith, Brown, Ferrero, Jones, Ouchi, Rusnack, Rutledge, Schenk, Taylor, and Yardley; and the 2015 Annual Report was reviewed, approved, and signed by Director Defendants Reed, Boeckmann, Brocksmith, Brown, Ferrero, Jones, Ouchi, Rusnack, Rutledge, Schenk, Taylor, and Yardley.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

that, in 2013 California passed a new law that required the CPUC to more strictly

police utilities through a new safety enforcement program by July 1, 2014:

> "***The California Utilities are subject to increasingly stringent safety standards and the potential for significant penalties if regulators deem either SDG&E or SoCalGas to be out of compliance***.  The California State Senate passed legislation in 2013 (SB 291) which requires the CPUC to develop and maintain a safety enforcement program that includes procedures for monitoring, data tracking and analysis, and investigations, as well as delegates citation authority to CPUC staff personnel under the direction of the CPUC Executive Director. This legislation requires the CPUC to implement the enforcement program for natural gas safety by July 1, 2014 and for electric safety by January 1, 2015. In exercising the citation authority, the CPUC staff will take into account voluntary reporting of potential violations, voluntary resolution efforts undertaken, prior history of violations, the gravity of the violation, and the degree of culpability."

108.   The Defendants knew about the new law (which is now codified as

Cal. Public Utilities Code §1702.5) and knew the CPUC was required to

implement the enforcement program for natural gas safety by July 1, 2014.  As

such, it was incumbent on the defendants, as officers and directors of Sempra and

SoCalGas, to take active and concerted efforts to ensure that SoCalGas' safety

measures concerning natural gas were improved in order to avoid fines and

penalties from the CPUC, in addition to the obvious need to also avoid

endangering the health and safety of the public.  As the Director Defendants

admitted in the Company's 2014 Annual Report (which they reviewed, approved,

and signed, as indicated *supra*), the failure to adopt and implement adequate

safety measures and voluntary reporting procedures for natural gas operations

could have a materially adverse effect on the Company:

> "If the CPUC or its staff determine that either of SDG&E's or SoCalGas' operations and practices are not in compliance with the safety standards, the corrective actions required to be in conformance and any penalties imposed could materially adversely affect the

respective company's cash flows, financial condition, results of operations and prospects."

109.    Indeed, Defendants were well aware that SB291 was introduced in large part due to egregious conduct by fellow California utility PG&E in connection with the 2010 San Bruno explosion that killed eight people, injured 58 more, and caused over $500 million in damages to property owners.  PG&E's gas utility, Pacific Gas & Electric Company, was ultimately indicted for its wrongdoing, and that criminal trial is set to commence on April 26, 2016 in San Francisco.  In addition to PG&E's wrongdoing, based in substantial part on underspending on gas pipeline safety and obstructing the government's investigation of the San Bruno blast, the California Legislature also found that the CPUC was blameworthy for lax oversight of PG&E and thus proposed SB291 as a bill to address such issues and protect the public.  Indeed, the legislative analysis accompanying the bill when it was introduced stated:  "Both the National Transportation Safety Board and the PUC's own Independent Review Panel found the PUC's enforcement posture to have been weak before the San Bruno explosion. Both bodies made the same specific recommendation: allow staff to have the direct authority to fine for pipeline safety violations."

110.    Thus, the purpose of SB291 was well known, especially to Defendants, who therefore had actual knowledge that the CPUC was legally required to be especially vigilant about policing natural gas pipeline and storage safety after July 1, 2014.  Thus, the new law and the Defendants' knowledge of its direct application to SoCalGas obligated the Defendants to take active and concerted steps beginning in 2013 to ensure that the Company spent adequate funds on natural gas safety measures.

111.    The defendants were also acutely aware that the Aliso Canyon well is a key natural gas storage facility for SoCalGas.  Indeed, as admitted in the Company's SEC filings, it is only one of four underground natural gas storage

41

facilities that the Company owns.

112.   Indeed, Aliso Canyon is the largest of SoCalGas' four storage fields in all regards: largest inventory capacity at 86.2 Bcf, largest withdrawal capacity at 1,860 million MMcfd, and largest firm injection capacity at 413 MMcfd (pre-Aliso Canyon Turbine Replacement Project).[18]

113.   SoCalGas's four storage fields that interconnect with its transmission system are Aliso Canyon, Honor Rancho, La Goleta, and Playa del Rey.  All four wells are located near the primary load centers of the SoCalGas system. They have a combined inventory capacity of 135.6 Bcf, a combined firm injection capacity of 850 MMcfd, and a combined firm withdrawal capacity of 3,680 MMcfd. Some systems, such as the PG&E gas transmission system, have significant linear pipelines and rely heavily on linepack (storing gas in the pipeline as opposed to within a storage facility) for storage. SoCalGas's system does not have as much linepack as others. It operates using storage and pipeline supplies to meet customer demand. The SoCalGas system cannot function with only pipeline supply or with only storage supply. ***As a result, storage fields are a much more critical operating asset on the SoCalGas system***.[19]

114.   Thus, the safety of the Aliso Canyon facility is critical to SoCalGas's ability to provide natural gas to its customers.

115.   Moreover, SoCalGas had injected natural gas into the Aliso Canyon well shortly before the leak, as part of the normal seasonal preparation for the winter heating season in Southern California.  As the Company's Annual Report

---

[18]     *See* ALISO CANYON RISK ASSESSMENT TECHNICAL REPORT, dated April 5, 2016, prepared by the CPUC, California Energy Commission, the California Independent System Operator, the Los Angeles Department of Water and Power, and Southern California Gas Company, at p. 7 (available at https://tribktla.files.wordpress.com/2016/04/aliso_canyon_risk_assessment_technical_report.pdf (last visited April 5, 2016)).

[19]     *Id*.

noted:

> "The natural gas distribution business is seasonal, and cash provided
> from operating activities generally is greater during and immediately
> following the winter heating months. As is prevalent in the industry,
> **SoCalGas injects natural gas into storage during the summer
> months (usually April through October)**, which reduces cash
> provided from operating activities during this period, for withdrawal
> from storage during the winter months (usually November through
> March), which increases cash provided from operating activities,
> when customer demand is higher."[20]

116.   Moreover, the Individual Defendants knew that the 18 wells that date back to the 1950s at the Aliso Canyon facility, a depleted oil field, were not drilled for the purpose of injecting or withdrawing natural gas but to suck out oil from underground.  They knew that the Aliso Canyon facility was outdated, dilapidated, and did not have modern and updated safety equipment.  They thus had a heightened duty to prioritize the Aliso Canyon facility and bring it into modern safety standards.  In derogation of their fiduciary duties, Defendants intentionally underspent on safety measures at Aliso Canyon in order to save the Company money in the short run, while recklessly risking disastrous financial penalties to the Company in the future.

117.   The Defendants knew that the well casings and the pipes inside of the vintage wells at Aliso Canyon were more than 60 years old, and that at least some lacked deep subsurface safety valves that would be costly to replace.  Again, Defendants chose cost savings over safety.

118.   Instead of actually spending money to make the Aliso Canyon wells safe through capital improvements, Defendants, obviously aware of the July 1, 2014 effective date of SB291, caused SoCalGas to paper up an "Aliso Canyon Safety Plan" which was dated May 2, 2014.  The plan did not call for the

---

[20]    *See* Form 10-K filed 2/26/16.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

involvement of any senior Company executives in the safety plan, and instead ensconced an electrical engineer as the lead member of the Aliso Canyon Safety Committee.  The main purpose of the safety plan seems to have been to "meet the needs of the high fire dangers and unique conditions of Aliso Canyon" and thus primarily addresses fire hazards at Aliso Canyon.  The safety plan, while lengthy, mostly encouraged employees to pay lip service to safety by always "dress[ing] appropriately for work [and] perform[ing] the circle of safety." The safety plan, while well-intentioned, did absolutely nothing to address the infrastructure problems and lack of functioning safety valves and other problems at Aliso Canyon.  Thus, rather than spending money on real, exigent circumstances, the Defendants caused the Company to waste money on feel good "safety plans" that they hoped would provide an appearance of safety preparation to ameliorate any fines by the CPUC in the wake of the effectiveness of SB291.

119.   Indeed, due to the wrongdoing associated with the Aliso Canyon well, SoCalGas is now subject to a moratorium prohibiting it from injecting or withdrawing natural gas into the Aliso Canyon well, as the Company admitted in its Annual Report filed February 26, 2016.

120.    As a result, the CPUC has recently announced that Southern California residents may expect rolling blackouts of at least 14 days during the summer of 2016 for electricity and 16 days for natural gas.[21]

121.   While the relationship of natural gas supply to electricity blackouts may not be self-evident, the Company has several generators of electricity that are powered by natural gas.  When demand for electricity is at peak levels, the gas-powered electricity generators are needed to meet the peak demand.  SoCalGas has explained the relationship as follows:  "The Aliso Canyon Gas storage facility

---

[21]    *See* ALISO CANYON RISK ASSESSMENT TECHNICAL REPORT, dated April 5, 2016, *supra* n. 10, at p. 4.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

is integral to the reliable operation of the electric grid and infrastructure. Gas storage acts like a shock absorber for the real-time dynamic variations in electric demand. These facilities also provide additional gas delivery capacity when gas demand exceeds the amount of flowing supply and provides a place to inject unutilized gas when electric demand is less than expected. In both summer and winter, gas storage supports electric reliability when there are significant differences between flowing gas supply and actual gas demand."[22]

122.   Thus, the Aliso Canyon well leak has impaired not only the Company's ability to provide natural gas, but also electricity.

123.   As these facts demonstrate, Sempra's Board had actual knowledge of the substantial environmental, public health, and economic risks posed by the Well, yet intentionally chose to relegate well safety to second-class citizen status by adopting a dual-track safety program, pursuant to which the Company adopted and implemented a modern and effective TIMP program for pipelines, yet refused to implement a SIMP program for wells and refused to spend the necessary funds to repair the Company's naturel gas wells, including Aliso Canyon, its largest and oldest well.   Moreover, as noted above, the Board caused Sempra to: (i) fail to safely maintain the Well; (ii) fail to timely notify proper authorities upon discovery of the gas leak; (iii) fail to timely initiate its contingency plan for plugging the Well; (iv) fail to timely provide adequate temporary housing to thousands of gas leak victims in the area surrounding the Well; and (v) cause significant damage to the environment.

**E.    The Defendants' Wrongful Conduct Causes the Company to be Sued in Dozens of Cases, Exposing the Company to Hundreds of Millions of Dollars in Damages**

124.   As a direct result of the Director Defendants' breaches of their

---

[22]   *See* ALISO CANYON RISK ASSESSMENT TECHNICAL REPORT, dated April 5, 2016, *supra* n. 10, at p. 10.

fiduciary duties, SoCalGas is the subject of over 83 lawsuits, many of which name Sempra Energy and Does 1-100, who likely will include the Director Defendants, including *State v. SoCalGas* which explicitly describes the Director Defendants as the Does that will ultimately be named. The lawsuits plead causes of action for negligence, strict liability, property damage, fraud, nuisance, and trespass, among other things.

125. Moreover, the Los Angeles City Attorney, Los Angeles County Counsel, and California Attorney General, acting in her independent capacity and on behalf of the people of the State of California and the California Air Resources Board, filed a complaint against Sempra's SoCalGas for public nuisance and violations of the California Unfair Competition Law, the California Health and Safety Code section 41700, prohibiting discharge of air contaminants that cause annoyance to the public, and §25510, requiring the prompt reporting of the release of hazardous material, as well as the California Government Code section 12607 for equitable relief for the protection of natural resources. The Los Angeles County Department of Public Health, South Coast Air Quality Management District filed a complaint against SoCalGas seeking civil penalties for alleged violations of several nuisance-related statutory provisions arising from the leak and delays in stopping the leak, seeking up to $250,000 in civil penalties for each day the violations occurred.

126. On February 2, 2016, the Los Angeles District Attorney's Office filed a criminal complaint against SoCalGas which seeks penalties for alleged failure to provide timely notice of the leak pursuant to California Health and Safety Code section 25510(a), Los Angeles County Code section 12.56.030, and Title 19 California Code of Regulations section 2703(a), and for violating California Health and Safety Code Section 41700, prohibiting discharge of air contaminants that cause annoyance to the public. The criminal complaint principally alleges that not only did SoCalGas release air contaminants, but also

46

1  failed to report this release of hazardous material to the necessary government

2  agencies, including the California Emergency Management Agency, until

3  October 26, 2015, despite admittedly detecting the leak on October 23, 2015.

4    127. Needless to say, the damage to the Company from the lawsuits is

5  material.  The Company reported to the SEC that, as of December 31, 2015,

6  SoCalGas had already incurred $50 million to address the Aliso Canyon well leak

7  and mitigate the environmental and community impact of the leak. *SoCalGas's*

8  *current estimate of costs to be paid to address the leak and mitigate*

9  *environmental and community impacts is between $250 million and $300 million.*

10    128. The $250 million to $300 million estimate does not include the

11  significant costs that will be incurred to defend the individual, class action,

12  regulatory, and criminal lawsuits that the Company faces and the damages and

13  penalties that will be levied as a result thereof.  Those costs will be material to the

14  Company from a financial point of view and will impact the Company's cash

15  flows, financial condition, and results of operations.

16  **F. Defendants Boeckmann, Ouchi, Rusnack, Rutledge, and Schenk**
   **Reward the Company's Top Executives With Huge Bonuses for 2015,**

17  **Notwithstanding the Disastrous Aliso Canyon Well Leak**

18    129. When Sempra filed its 2016 Proxy Statement on March 25, 2016, it

19  was disclosed that the Director Defendants, including the Compensation

20  Committee members, had awarded huge bonuses to the Company's executives,

21  notwithstanding the disastrous Aliso Canyon well leak and the huge financial

22  costs to the Company resulting from the leak.  The Proxy states:

23  **BONUSES PAID TO NAMED EXECUTIVE OFFICERS FOR 2015 PERFORMANCE**

| | Base Salary at Year-End 2015 | x | Bonus Target | x | Performance Score[1] | = | Bonus[2] |
|---|---|---|---|---|---|---|---|
| Debra L. Reed | $ 1,350,000 | | 125% | | 188% | $ | 3,170,000 |
| Mark A. Snell[3] | $ 854,100 | | 95% | | 188% | $ | 1,525,000 |
| Joseph A. Householder | $ 655,100 | | 80% | | 188% | $ | 984,500 |
| Martha B. Wyrsch | $ 561,000 | | 70% | | 188% | $ | 737,700 |
| Steven D. Davis[4] | $ 541,400 | | 63% | | 188% | $ | 616,400 |

27    130. Thus, despite the harm caused to the Company, the Director

28  Defendants awarded massive bonuses to executive officers which far outstripped

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

their annual salaries.  The Compensation Committee members did not hold the executives accountable, despite the fact that the Company's governance principles state the environmental and legal compliance should be considered in awarding executive compensation.  The Compensation Committee of the Board (comprised of Defendants Boeckmann, Ouchi, Rusnack, Rutledge, and Schenk) acknowledged the Aliso Canyon leak disaster in its evaluation of executive compensation, stating:  "The committee may apply discretion in determining the results of the performance measures or in consideration of the contributions of each named executive officer. For 2015, the Compensation Committee determined that there would be no payout for certain operational performance measures. In light of the Aliso Canyon natural gas leak, negative discretion was exercised to provide no payout for SoCalGas safety measures and certain customer satisfaction measures."  However, despite saying that "there would be no payout for certain operational performance measures" due to the Aliso Canyon well leak, the Compensation Committee awarded the executives bonuses of 187% of the executives' annual salaries, due to calculations which minimized the importance of safety and legal and environmental compliance in the calculation of the executives' bonuses.  Thus, the Director Defendants handsomely rewarded the executive officers for their poor stewardship, despite paying lip service to the massive harm caused to the Company and its shareholders due to the Aliso Canyon well leak.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

131.   During the relevant period, Plaintiff did not discover and could not have discovered, through the exercise of due diligence, Defendants' breaches of their fiduciary duties or their violations of California law because Defendants did not disclose, and actively concealed, their wrongful conduct.

132.   Plaintiff was unaware of and had no knowledge of Defendants' breaches of fiduciary duties until shortly before this complaint was filed.

133.   Plaintiff could not have discovered Defendants' breaches of fiduciary duties and violations of law prior to filing suit because Defendants made absolutely no disclosure of the wrongdoing related to the Aliso Canyon well in any of the Company's public SEC filings.

134.   Moreover, Defendants not only failed to disclose any information whatsoever that would have allowed Plaintiff, exercising due diligence, to discover the unlawful conduct, but Defendants also intentionally concealed and attempted to disguise their unlawful conduct in order to avoid detection by shareholders and consumers.

135.   Defendants fraudulently concealed their unlawful conduct by, among other things, affirmatively misrepresenting to shareholders and the public that SoCalGas had committed sufficient resources to safety measures designed to prevent any environmental disasters like the Aliso Canyon well leak.  Defendants knew their violations of law violated their fiduciary duties as officers and directors of the Company and thus actively and fraudulently concealed their wrongdoing from their shareholders and the public.

**DAMAGES TO SEMPRA**

136.   The Individual Defendants' improprieties have already cost Sempra over $50 million in attempts to address the Well leak and mitigate environmental and community impacts.  Experts estimate that this disaster will ultimately cost Sempra billions of dollars in fines, remediation, and investigation costs.  Such expenditures include, but are not limited to:

    a.    costs incurred in sealing the Well;

    b.    environmental remediation costs ordered by the state, which alone cost Sempra hundreds of millions of dollars;

    c.    costs incurred from paying overtime or other costs associated with extra Los Angeles Police Department security patrols;

    d.    costs incurred from responding to multiple governmental agency investigations;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

e.   costs incurred from defending and paying any settlements in the litany of cases filed against the Company; and

f.   costs incurred from potential fines and/or penalties for the public nuisance and massive environmental destruction caused by the Well leak.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

137.   Plaintiff brings this action derivatively in the right and for the benefit of Sempra to redress injuries suffered, and to be suffered, by Sempra as a direct result of breaches of fiduciary duties, as well as the aiding and abetting thereof, by the Individual Defendants.  Sempra is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

138.   Plaintiff will adequately and fairly represent the interests of Sempra in enforcing and prosecuting its rights.

139.   Plaintiff was a stockholder of Sempra at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Sempra stockholder.  The current Board of Sempra consists of the following twelve individuals: defendants Reed, Rusnack, Jones, Ouchi, Brocksmith, Rutledge, Schenk, Boeckmann, Taylor, Yardley, Brown, and Ferrero.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**A.   Demand Is Excused Because the Director Defendants Face a Substantial Likelihood of Liability for Their Misconduct**

140.   As alleged above, defendants Reed, Rusnack, Jones, Ouchi, Brocksmith, Rutledge, Schenk, Boeckmann, Taylor, Yardley, Brown, and Ferrero breached their fiduciary duties of loyalty by failing to establish and promptly implement appropriate safety plans at the Well.  Based on their own statements in the Company's SEC filings, it is clear that these defendants were well aware of

50

the tremendous environmental, public health, and financial risks posed by the Well, yet failed to take meaningful action to mitigate those risks and prevent harm to people and the Company.  Instead, these defendants created conditions which allowed the Well to fail, and then exacerbated the effects of the disaster by causing or allowing Sempra to fail to promptly notify authorities, fail to immediately begin construction of a relief well, and fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so.

141.   Indeed, Defendants Reed, Rusnack, Jones, Ouchi, Brocksmith, Rutledge, Schenk, Boeckmann, Taylor, Yardley, Brown, and Ferrero knew that the safety valve at SS-25 had been removed in the past, and approved SoCalGas's repeated decision not to replace the valve.  On December 15, 2015, Schwecke, a SoCalGas executive who is helping to coordinate the response to the leak, was asked by reporters about the safety valve at SS-25.  Schwecke responded that the safety valve was not damaged, and had actually been removed in 1979.  According to Schwecke, in 1979 the valve was old and leaking, and Sempra opted to remove instead of repair the valve because it was difficult to find a new part.  This admission came nearly five years after SoCalGas requested and obtained regulatory permission to increase rates to replace the many leaking valves at the Aliso Canyon storage field.  Despite the ratepayer increase and annual profits of nearly $100 million, SoCalGas never installed a new safety valve.  The Director Defendants knew the valve was missing and yet approved operating plans for Aliso Canyon which did not call for replacement of the valve.  Such conduct constituted bad faith and a breach of the directors' duty of loyalty.

142.   Moreover, according to the California Legislature, the Director Defendants, which included at the time Defendants Reed, Rusnack, Jones, Ouchi, Brocksmith, Rutledge, Schenk, Boeckmann, Taylor, Yardley, Brown, and Ferrero, were aware of increasing well integrity problems at Aliso Canyon and

51

had proposed a still-pending-before-the-Commission Storage Integrity Management Program (SIMP) in November 2014, for implementation as of October 2015, as alleged *supra*. Notwithstanding, however, such Defendants' knowledge of the increasing well integrity problems at Aliso Canyon, *the leaking well SS-25 was not one of those designated for the program and the SIMP itself was never implemented*.

143. Moreover, as alleged herein, prior to the time SoCalGas proposed the SIMP in November 2014, the Director Defendants had actual knowledge, as demonstrated by Phillip Baker's presentations, that SoCalGas employed a wholly deficient and inadequate approach to natural gas well safety, pursuant to which the Company employed a disparate treatment of underground gas wells compared to gas transmission pipelines. Baker, speaking on behalf of SoCalGas as the Director of Storage, responsible for maintaining the integrity of the natural gas storage system, had told both the Board of Directors and the CPUC that "*we believe it is critical that we adopt a more proactive and in-depth approach. Historically, safety and risk considerations for wells and their associated valves and piping components have not been addressed in past rate cases to the same extent that distribution and transmission facilities have been* under the Distribution and Transmission integrity management programs."[23]

144. The Director Defendants were thus fully aware of and had approved at all relevant times a bifurcated approach to natural gas safety, pursuant to which well safety had been intentionally relegated to an inferior stepchild status, with well safety only being "qualitatively" and informally analyzed, contrasted with the "state of the art" objective and scientific analysis performed on gas pipelines. As Baker had advised the Board, "Risk management activities, processes, and

---

[23] *See* SoCalGas, Direct Testimony of Phillip E. Baker Before the CPUC, November 2014, at p. PEB-5.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1   procedures for well integrity should have a focus similar to those employed under

2   the Company's pipeline risk mitigation programs."

3       145.   The Director Defendants' reckless approach to natural gas well

4   safety, and their intentional decision to not adopt and implement a modern,

5   effective and comprehensive risk assessment program for the Company's natural

6   gas wells, despite knowledge of increasing integrity problems at the wells,

7   constitutes bad faith and disloyal conduct – conduct which cannot be indemnified

8   and thus which subjects the Director Defendants to a substantial likelihood of

9   liability.

10      146.   Both Sempra Energy and Southern California Gas Company are

11  California corporations.  California has many more restrictions on

12  indemnification and exculpation of officers and directors of California

13  corporations than does Delaware. *California prohibits exculpation of directors*

14  *and officers for acts or omissions that involve the absence of good faith, for acts*

15  *or omissions that demonstrate a reckless disregard of duty to the corporation or*

16  *its shareholders in circumstances in which the officer or director was aware, or*

17  *should have been aware, of a risk of serious injury to the corporation or its*

18  *shareholders, and for acts or omissions that constitute an unexcused pattern of*

19  *inattention that amounts to abdication of duty.*

20      147.   Defendants Brocksmith, Rutledge, Schenk, Taylor, Yardley, Brown,

21  and Ferrero, as members of the Environmental, Health, Safety and Technology

22  Committee, owed specific duties to Sempra to assist the Board in overseeing "the

23  Company's programs and performance related to environmental, health, safety

24  and technology matters."  As stated in the Charter, these defendants were aware

25  that the "Company's operational performance can affect the environment as well

26  as the health and safety of employees and other stakeholders in the communities

27  we serve and beyond."  Nonetheless, these defendants utterly failed to establish

28  and promptly implement appropriate risk assessment and remediation plans for

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1    the Well, and also failed to implement contingency plans to deal with the Well

2    disaster and the subsequent (and continuing) fallout.

3        148.   Defendants Jones, Brocksmith, Schenk, Taylor, Yardley, and

4    Ferrero, as Members of the Audit Committee, owed specific duties to Sempra to

5    ensure its "compliance with legal and regulatory requirements." These

6    defendants nonetheless failed to immediately notify authorities of the leak, as

7    required by law, and failed to timely provide adequate temporary housing to the

8    thousands of affected residents, despite specific orders from the Health

9    Department instructing Sempra to do so.

10       149.   Sempra has been and will continue to be exposed to significant

11    losses due to the wrongdoing complained of herein. Despite the Individual

12    Defendants having knowledge of the claims and causes of action raised by

13    plaintiff, the current Board has failed and refused to seek to recover for Sempra

14    for any of the wrongdoing alleged by plaintiff herein.

**CAUSES OF ACTION**
**COUNT I**
**Against the Individual Defendants and Does 1-25**
**for Breach of Fiduciary Duty**

18       150.   Plaintiff incorporates by reference and realleges each and every

19    allegation contained above, as though fully set forth herein.

20       151.   The Sempra Individual Defendants and Does 1-25 owed and owe

21    Sempra fiduciary obligations. By reason of their fiduciary relationships, the

22    Sempra Individual Defendants owed and owe Sempra the highest obligation of

23    good faith, fair dealing, loyalty, and due care.

24       152.   The SoCalGas Individual Defendants and Does 1-25 owed and owe

25    SoCalGas fiduciary obligations. By reason of their fiduciary relationships, the

26    SoCalGas Individual Defendants owed and owe SoCalGas the highest obligation

27    of good faith, fair dealing, loyalty, and due care.

28       153.   The Individual Defendants and Does 1-25, and each of them,

54

violated and breached their fiduciary duties of candor, good faith, and loyalty. More specifically, the Individual Defendants and Does 1-25 violated their duty of good faith by creating a culture of lawlessness within Sempra and SoCalGas, respectively, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

154.   The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) the Well was unsafe; and (ii) Sempra lacked an appropriate contingency plan in the event of a leak at the Well.  These defendants further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so.  These actions exposed Sempra to billions of dollars in damages.  Accordingly, the Officer Defendants breached their duty of loyalty to Sempra.

155.   The SoCalGas Individual Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The SoCalGas Individual Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) the Well was unsafe; and (ii) SoCalGas lacked an appropriate contingency plan in the event of a leak at the Well.  These defendants further caused or allowed SoCalGas to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing SoCalGas to do so.  These actions exposed SoCalGas to billions of dollars in damages. Accordingly, the SoCalGas Individual Defendants breached their duty of loyalty to SoCalGas.

156.   The Director Defendants, as directors of Sempra, owed Sempra the highest duty of loyalty.  The Director Defendants either knew or were reckless in

not knowing: (i) the Well was unsafe; and (ii) Sempra lacked an appropriate contingency plan in the event of a leak at the Well.  These defendants further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so.  These actions exposed Sempra to billions of dollars in damages.  Accordingly, the Director Defendants breached their duty of loyalty to Sempra.

157.   As a direct and proximate result of the Individual Defendants' and Does 1-25's breaches of their fiduciary obligations, the Company has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

158.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT II
### For Breach of the Duty of Honest Services
**(Against Defendants Reed, Householder, Davis, Bird, Arriola, Cho, D. Schneider, M. Schneider, Furgerson, Minter, Lane and Wyrsch)**

159.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

160.   This claim is brought derivatively on behalf of the Company against Defendants Reed, Householder, Davis, Bird, Arriola, Cho, D. Schneider, M. Schneider, Furgerson, Minter, Lane and Wyrsch for breach of their undivided duty of loyalty to their employer.

161.   During at least a portion of the Relevant Period, all Defendants were employees of the Company.

162.   Defendants breached their duty of loyalty to the Company by not acting solely in the Company's interests in performing their employment duties. As a result of the Individual Defendants' breaches of duty, the Company is being sued by multiple governmental entities, including the California Attorney General, for creating and failing to abate a nuisance and violation of the following

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

California laws:  Cal. Health & Safety Code §41700; Cal. Bus. & Prof. Code §17200; Cal. Health & Safety Code §25510; Cal. Civil Code §3479; C.C.P. §731; and Cal. Gov't Code §12607.

163.   Those breaches of duty consisted of the conduct alleged in this complaint including, without limitation, their conduct in causing the Company to (i) conceal the fact that the Company was not spending necessary and available funds on required natural gas safety efforts; (ii) deceive the shareholders of the Company regarding the Company's compliance with federal and state laws and regulations regarding natural gas storage and transmission safety; and (iii) delay reporting the Aliso Canyon well leak to authorities and delay a prompt and effective response to the leak and necessary remediation efforts.  Defendants benefitted from their wrongdoing because they were allowed to retain their jobs in exchange for their unlawful conduct and because they received compensation that was directly tied to the Company's financial performance, which was greater than it would have been absent the Defendants' wrongful conduct.

164.   The Company was harmed by these Defendants' breaches of the undivided duty of loyalty.

165.   By reason of the foregoing, the Company was harmed and will continue to suffer harm as described in greater detail above.

**COUNT III**
**Aiding and Abetting Breaches of Fiduciary Duties**
**(Against All Individual Defendants)**

166.   Plaintiff realleges and incorporates by reference the allegations contained above as though fully set forth herein.

167.   This cause of action is brought against all Individual Defendants for aiding and abetting breaches of fiduciary duties.

168.   As alleged above, all Individual Defendants are current or former officers and/or directors of Sempra Energy and/or SoCalGas.  As such, all Individual Defendants owed fiduciary duties of good faith, loyalty, candor and

57

care to the Company.  Through the conduct alleged herein, Defendants breached their fiduciary duties to the Company.  In the alternative, the conduct of all Defendants, whether or not it constituted an independent violation of fiduciary duty, constituted aiding and abetting the breach of fiduciary duties.

169.  All Defendants knew that the other Defendants' conduct violated those Defendants' fiduciary duties to the Company.

170.  As alleged above, Defendants substantially aided or encouraged the other Defendants to breach their fiduciary duties to Sempra and/or SoCalGas. Such aid and encouragement included, without limitation, these Defendants' participation in knowing or reckless violation of federal and state natural gas pipeline storage and safety rules and regulations, knowing or reckless disregard of the duties of candor, good faith, loyalty, and care, and failure to promptly report and respond to the Aliso Canyon well leak.

171.  As alleged above, the Company was harmed by the other Defendants' breaches of their fiduciary duties.

172.  By reason of the foregoing, the Company has sustained and will continue to sustain damages as described in greater detail above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the Company, demands judgment as follows:

A.  Against all of the defendants and in favor of the Company for the amount of damages sustained by them as a result of the defendants' breaches of fiduciary duties;

B.  Directing Sempra to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Sempra and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholders' vote, resolutions for amendments to Sempra's By-Laws or Articles of

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Incorporation and taking such other action as may be necessary to place before stockholders for a vote on the following corporate governance proposals:

   1. a proposal to require Sempra and SoCalGas to adopt and implement a thorough and comprehensive SIMP to address and make necessary repairs and capital improvements to the Company's natural gas storage wells and transmission facilities;

   2. a proposal to require Sempra and SoCalGas to adopt and implement a plan to achieve full remediation of the environmental effects of the Aliso Canyon leak;

   3. a proposal to strengthen Sempra's controls over its subsidiaries, including SoCalGas and SDGE;

   4. a proposal to create a Board-level committee to oversee natural gas well safety and well failure contingency planning;

   5. a proposal to adopt term limits prohibiting any person from serving on the Board of Sempra or SoCalGas for more than eight (8) years; and

   6. a provision to permit the stockholders of Sempra to nominate at least two candidates for election to the Board.

  C. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions;

  D. Awarding to the Company restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation unjustly obtained by the defendants;

  E. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

  F. Granting such other and further relief as the Court deems just and proper.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURY TRIAL DEMAND

Plaintiff demands a jury trial of all issues subject to adjudication by a trier of fact.

Dated:  April 25, 2016

Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (175783)
Albert Y. Chang (296065)
Yury A. Kolesnikov (271173)

s/ Francis A. Bottini, Jr.
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:     (858) 914-2001
Facsimile:      (858) 914-2002
E-mail:          fbottini@bottinilaw.com
                achang@bottinilaw.com
                ykolesnikov@bottinilaw.com

*Attorneys for Plaintiff Arthur Fischman*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Arthur Fischman, verify that I am a shareholder of Sempra Energy.  I have reviewed the allegations in this Shareholder Derivative Complaint (the "Complaint").  As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true.  Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: _____April 6_____, 2016

_____
Arthur Fischman