1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

ARTHUR FISCHMAN, derivatively
on behalf of SEMPRA ENERGY and
SOUTHERN CALIFORNIA GAS
COMPANY,

Plaintiff,

v.

DEBRA L. REED; JOSEPH A.
HOUSEHOLDER; STEVEN D.
DAVIS; JUSTIN C. BIRD; WILLIAM
C. RUSNACK, WILLIAM D. JONES;
WILLIAM G. OUCHI; JAMES G.
BROCKSMITH, JR.; WILLIAM P.
RUTLEDGE; LYNN SCHENK,
ALAN L. BOECKMANN; JACK T.
TAYLOR; JAMES C. YARDLEY;
KATHLEEN L. BROWN; PABLO A.
FERRERO; LUIS M. TELLEZ;
DENNIS V. ARRIOLA; JIMMIE I.
CHO; MICHAEL M. SCHNEIDER;
DOUG SCHNEIDER; SCOTT
FURGERSON; GEORGE MINTER; J.
BRET LANE; MARTHA B.
WYRSCH; JESSE J. KNIGHT, JR;
and DOES 1-25, Inclusive

Defendants,

and

SEMPRA ENERGY; and
SOUTHERN CALIFORNIA GAS
COMPANY

Nominal Defendants

CASE NO. 16cv1006-WQH-AGS

ORDER

HAYES, Judge:

The matters before the Court are the motion to dismiss filed by Sempra Energy
and Southern California Gas Company (collectively, the "Nominal Defendants") (ECF
No. 34); the motion to dismiss and joinder filed by Alan. L. Boeckmann, James G.

Brocksmith, Jr., Kathleen L. Brown, Pablo A. Ferrero, William D. Jones, William G. Ouchi, Debra L. Reed, William C. Rusnack, William P. Rutledge, Lynn Schenk, Jack T. Taylor, and James C. Yardley (collectively, the "Directors") (ECF No. 35); and, the motion to dismiss filed by Dennis V. Arriola, Justin C. Bird, Jimmie I. Cho, Steven D. Davis, Scott Furgerson, Joseph A. Householder, Jesse J. Knight, Jr., J. Bret Lane, George Minter, Doug Schneider, Michael M. Schneider, and Martha B. Wyrsch (collectively, the "Officers") (ECF No. 37).

## I. Procedural Background

On April 25, 2016, Plaintiff Arthur Fischman, derivatively on behalf of Sempra Energy ("Sempra") and Southern California Gas Company ("SoCalGas"), initiated this action by filing a shareholder derivative complaint against members of the Board of Directors of both companies for their actions relating to a natural gas leak at the Aliso Canyon natural gas storage facility. (ECF No. 1). The complaint alleges the following three causes of action: (1) Breach of Fiduciary Duty by Sempra Individual Defendants and the SoCalGas Individual Defendants[1]; (2) Breach of the Duty of Honest Services against Reed, Householder, Davis, Bird, Director and Arriola, Cho, D. Schneider, M. Schneider, Furgerson, Minter, Lane and Wyrsch; (3) Aiding and Abetting Breaches of Fiduciary Duties against all Individual Defendants. *Id.*

On August 1, 2016, the Nominal Defendants Sempra and SoCalGas filed a motion to dismiss with prejudice on the grounds that Plaintiff failed to adequately plead facts to demonstrate demand futility pursuant to Federal Rule of Civil Procedure 23.1. (ECF No. 34). Nominal Defendants also filed a request for judicial notice.[2] (ECF No. 34-2). On September 9, 2016, Plaintiff filed a response in opposition to t. (ECF No. 40). On September 23, 3016, Nominal Defendants filed a reply. (ECF No. 43).

---

[1] Plaintiff defines "Individual Defendants" at multiple points in the complaint. (ECF No. 1 at ¶¶ 1, 52, 168).

[2] The Court denies Nominal Defendants' request for judicial notice as unnecessary to the resolution of this matter. *See, e.g., Asvesta v. Petroutsas*, 580 F.3d 1000, 1010 n.12 (9th Cir. 2009) (denying request for judicial notice where judicial notice would be "unnecessary").

On August 1, 2016, Defendant Directors filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim against Defendant Directors. (ECF No. 35). On September 9, 2016, Plaintiff filed a response in opposition. (ECF No. 41). On September 23, 2016, Defendant Directors filed a reply. (ECF No. 45).

On August 1, 2016, Defendant Officers filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim against Defendant Officers.[3] (ECF No. 37). Defendant Officers also filed a request for judicial notice. (ECF No. 37-2). On September 9, 2016, Plaintiff filed a response in opposition. (ECF No. 42). On September 23, 2016, Defendant Officers filed a reply. (ECF No. 46).

On February 10, 2017, the Court heard oral arguments on the three pending motions to dismiss. (ECF No. 51).

**II. Allegations of the Complaint**

Plaintiff brings this verified shareholder's derivative suit "on behalf of nominal defendants [Sempra] and [SoCalGas] against certain officers and directors of Sempra and SoCalGas (collectively, the 'Company') for breaches of fiduciary duties and violations of law from April 20, 2010 to the present." (ECF No. 1 at ¶ 1). "SoCalGas is a wholly owned subsidiary of Sempra and provides natural gas distribution and storage services. Sempra is an energy-services holding company whose operating units invest in, develop, and operate energy infrastructure, and provide gas and electricity to their customers in North and South America." *Id.* at ¶ 7. "Plaintiff Arthur Fischman . . . has continuously been a stockholder of Sempra Energy since the Company's inception in 1998, and is a current Sempra stockholder." *Id.* at ¶ 24.

"This shareholder derivative action involves breaches of fiduciary duties by Defendants in connection with knowingly causing the Company to underspend on

---

[3] On October 7, 2016, the Officer Defendants filed a Notice of Errata stating that the Officer Defendants' motion to dismiss mistakenly included Defendant Justin C. Bird among those Defendants who are both SoCalGas Officers and Directors. Officer Defendants state that Bird is not a SoCalGas Director. (ECF No.38 at 2).

safety measures and remediation efforts at the Company's Aliso Canyon underground storage well (the "Well"), leading to a massive natural gas leak which existed for years at the well but was first discovered in October 2015." *Id.* at ¶ 1.  By the time the leak was capped on February 18, 2016, it had become "the largest methane leak in U.S. history." *Id.* "[T]he Company admitted in its most recent Annual Report filed with the SEC on Form 10-K on February 26, 2016" that numerous governmental agencies are investigating this incident, eighty-three lawsuits have been filed against SoCalGas, and the Los Angeles District Attorney's Office filed a misdemeanor criminal complaint against SoCalGas. *Id.* at ¶ 3. "The wrongdoing associated with the leak has already cost the Company more than $50 million in remediation costs.  Sempra and SoCalGas have also experienced significant damages to their reputation, goodwill, and standing in the business community." *Id.* at ¶ 4. "[T]hese actions have exposed the Company to billions of dollars in potential liability for violations of state and federal law." *Id.*

"Many of the lawsuits [filed against SoCalGas] name as defendants Does . . . who have been identified in part as those responsible for the oversight of Aliso Canyon." *Id.* at ¶ 5. "[T]he naming of these Doe defendants is meant to preserve claims against some of the Individual Defendants named herein, who were responsible to ensure that Sempra's SoCalGas was operating safely." *Id.* "[T]he Company is also being sued by . . . the California Attorney General . . . for creating and failing to abate a nuisance and violation of . . . California laws." *Id.* at ¶ 12. "SoCalGas's current estimate of costs to be paid to address the leak and mitigate environmental and community impacts is between $250 and $300 million" and does not include the costs that will be incurred to defend against lawsuits. *Id.* at ¶¶ 127-128.

Among the named defendants are twelve current members of the Sempra Board of Directors, Debra L. Reed[4], William C. Rusnack, William D. Jones, William G. Ouchi, James G. Brocksmith, Jr., William P. Rutledge, Lynn Schenk, Alan L.

---

[4] Debra L. Reed is Sempra's Chairman of the Board and Chief Executive Officer. (ECF No.1 at ¶ 27).

Boeckmann, Jack T. Taylor, James. C. Yardley, Kathleen L. Brown, and Pablo A. Ferrero. *Id.* at ¶¶ 27-41. All of the Sempra Directors joined the Sempra Board in 1998 or later. *Id.* With respect to each of these Sempra Directors, Plaintiff alleges,

> Defendant . . . either knew, was reckless, or was grossly negligent in not knowing that the Well was unsafe and Sempra lacked an appropriate contingency plan in the event of a leak at the Well. Defendant . . . further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so

*Id.* at ¶¶ 27-42. "By reason of their positions as officers and directors of Sempra and SoCalGas, each of the Individual Defendants owed and owe[s] the Company and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and were and are required to use their utmost ability to control and manage Sempra and SoCalGas in a fair, just, honest, and equitable manner." *Id.* at ¶ 54.

The Sempra Board is directly responsible for the misconduct alleged in the complaint and has "ultimate authority for all its operations." *Id.* at ¶¶ 65-66. "[T]he Board had direct responsibility for risk oversight." *Id.* at ¶ 68. In its last two annual Proxy Statements, the Company stated that "[t]he board has developed an integrated risk management framework to assess prioritize, manage and monitor risks across the company's operations" and that "the board has diversified its risk oversight responsibilities across its membership, housing categories of risk oversight within board committees by topic." *Id.* at ¶ 68. The Proxy Statement stated,

> The board reviews and monitors strategic, financial and operating plans that are intended to provide sustainable long-term growth with what it deems to be an acceptable level of risk. . . . The board fulfills its risk oversight function through receipt of reports provided both directly to the board and to appropriate board committees. Based on these reports, the board or appropriate committees establish or amend existing risk oversight and control mechanisms. In addition, the company has a robust internal audit function that reports directly to the Audit Committee.

*Id.*

Sempra Directors Brocksmith, Rutledge, Schenk, Taylor, Yardley, Brown and Ferrero "owed specific duties to Sempra to assist the Board in overseeing the Company's programs and performance related to environmental, health, safety, and technology matters" as members of the Environmental, Health, Safety, and Technology

Committee of the Sempra Board. *Id.* at ¶ 57. Sempra Directors Jones, Brocksmith, Schenk, Taylor, Yardley, and Ferrero "owed additional specific duties to Sempra to ensure its compliance with legal and regulatory requirements" as members of the Audit Committee of the Sempra Board. *Id.* at ¶ 61. The Sempra Directors, including the Compensation Committee of the Sempra Board consisting of Defendants Boeckmann, Ouchi, Rusnack, Rutledge, and Schenk, "awarded huge bonuses to the Company's executives, notwithstanding the disastrous Aliso Canyon well leak and the huge financial costs to the Company resulting from the leak." *Id.* at ¶ 130.

Aliso Canyon, one of the Company's four underground natural gas storage facilities, "is actually a collection of approximately 116 underground wells. . ." *Id.* at ¶¶ 76, 78. "The leaking well is referred to as Standard Sesnon-25 or 'SS-25'. . ." *Id.* "[T]he Well has been slowly leaking for over thirty-six years." *Id.* at ¶ 13. "[F]ive years ago SoCalGas requested and obtained regulatory permission to increase rates to replace the many leaking valves at the Aliso Canyon storage field." *Id.* "[I]nitial reports about the Well failure suggested that the safety valve failed" but "subsequent discovery . . . revealed that there was no safety valve at all." *Id.* "SoCalGas purportedly told the California Division of Oil, Gas, and Geothermal Resources ('DOGGR') that it 'replaced' the safety valve in 1979. In December 2015, however, SoCalGas admitted that Sempra actually removed the valve in 1979 because it was old at the time, leaking, and it was difficult to find parts for and then failed to repair or replace it." *Id.*

"On December 15, 2015, Roger Schewecke . . ., a SoCalGas executive who was helping to coordinate a response to the leak, was asked by reporters about the safety valve." *Id.* at ¶ 85. "Schwecke admitted that the safety valve was not damaged; it was removed in 1979." *Id.* "This admission came nearly five years after SoCalGas requested and obtained regulatory permission to increase rates to replace the many leaking valves at the Aliso Canyon storage field. Despite the ratepayer increase and annual profits of nearly $100 million, SoCalGas never installed a new safety valve. The

Director Defendants were aware of this decision and approved the decision not to replace the safety valve." *Id.*

"Individual Defendants were aware of increasing well integrity problems at Aliso Canyon and had proposed a [still pending] Storage Integrity Management Program (SIMP) for implementation as of October 2015." *Id.* at ¶ 86. "[T]he leaking well SS-25 was not one of those designated for the program." *Id.* "The decision not to replace the safety valve at Aliso Canyon and not to include SS-25 in the proposed SIMP, was a conscious decision made by the Director Defendants to put profits over safety." *Id.* at ¶ 87.

"Individual Defendants' knowledge of the needed repairs to the Aliso Canyon Well is demonstrated by the presentation that SoCalGas made to [the California Public Utilities Commission (CPUC)] in November 2014 regarding the proposed SIMP and recommended Operations and Maintenance expenses and capital improvements to SoCalGas' underground natural gas storage wells, including those at Aliso Canyon." *Id.* at ¶ 88. "In remarks prepared by Phillip E. Baker, Director of Gas and Distribution at SoCalGas, the Company admitted the substantial capital improvements needed at the Aliso Canyon underground wells." *Id.* "[A]s part of its presentation in November 2014 regarding necessary improvements at Aliso Canyon, Sempra candidly admitted that it had not spend the same resources on well safety as it had on gas transmission pipelines." *Id.* at ¶ 89. "In his remarks to the CPUC, Phillip Baker . . . stat[ed] 'we believe it is critical that we adopt a more proactive and in-depth approach. Historically, safety and risk considerations for wells and their associated valves and piping components have not been addressed in past rate cases to the same extent that distribution and transmission facilities have been under the Distribution and Transmission integrity management programs.'" *Id.* at ¶ 91. Baker noted the age, length, and location of the wells and stated, "Without a robust program to inspect underground storage wells to identify potential safety and/or integrity issues, problems may remain undetected within the high pressure above-ground wellheads, pipe laterals

. . . and below-ground facilities . . . among the 229 storage field wells." *Id.* at ¶ 93. "Baker told that CPUC in his written report and in his comments that major problems at SoCalGas' wells had developed, and were in fact a trend, stating: "In fact, a negative well integrity trend seems to have developed since 2008." *Id.* at ¶ 94. "Baker concluded by noting . . . 'Without the SIMP, SoCalGas will continue to operate in a reactive mode (with the potential for even higher costs to ratepayers) to address sudden failures of old equipment. In addition, SoCalGas and customers could experience major failures and service interruptions from potential hazards that currently remain undetected.'" *Id.* at ¶ 96. "Baker's November 2014 presentation was also based in part on material from [Defendant Schneider] . . . and the proposals and ultimate decisions were reviewed and approved by the Board of Directors of SoCalGas and Sempra." *Id.* at ¶ 97. "SoCalGas and Sempra were fully aware of and had approved at all relevant times a bifurcated approach to natural gas safety, pursuant to which well safety had been relegated to an inferior stepchild status." *Id.* at ¶ 92.

"When the Company discovered the massive gas leak at Sempra's Aliso Canyon natural gas storage reservoir on October 23, 2015, it did not report the leak immediately as required by law. Instead Sempra and SoCalGas waited days to notify state and federal agencies." *Id.* at ¶ 8. "Moreover, the Individual Defendants names as defendants herein consciously failed to cause the Company to take prompt and sufficient corrective actions to limit the damages caused to individuals, homeowners, and the Company itself from the leak. In fact, the Individual Defendants delayed more than a month in implementing a contingency plan for plugging the well. As a result, the well was not plugged until February 2016, and substantial damages were caused by the Company's unacceptably slow response to the leak." *Id.* at ¶ 9.

Residents of a nearby neighborhood reported a gas leak on October 23, 2015 and "SoCalGas 'went from home to home to home, giving everybody the A-OK and [...] didn't admit to having a gas leak until [...] probably around the 28th of October.'" *Id.* at ¶ 82. "[D]espite the fact that Sempra internally confirmed the leak on October 23,

2015, the Director Defendants caused Sempra to delay by at least five days notifying the authorities of the leak, in direct contravention of the law[.]" *Id.* at ¶ 83. "In light of the health risks to local residents, on November 19, 2015, the Health Department ordered Sempra to expedite leak abatement and to provide free, temporary relocation to any residents affected by the gas leak. Weeks later, and more than one month after SoCalGas crew states they discovered the leak . . . Sempra finally began the slow process of constructing the relief well." *Id.* at ¶ 84. "Commensurate with the Health Department's November 19, 2015 order, thousands of local residents have requested that Sempra provide temporary relocation due to the Well leak." *Id.* at ¶ 102. Sempra has "failed to timely and adequately provide the housing." *Id.* Sempra and SoCalGas disclosed that approximately 2,5000 households had been temporarily relocated as of January 2016, but at least 1,460 households' requests for temporary relocation had not yet been fulfilled. *Id.* at ¶ 103.

"The Individual Defendants . . . violated and breached their fiduciary duties of candor, good fath, and loyalty." *Id.* at ¶ 153. "[T]he Individual Defendants . . .violated their duty of good faith by creating a culture of lawlessness within Sempra and SoCalGas respectively, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein." *Id.* at ¶ 153. Plaintiff alleges,

> The Director Defendants, as directors of Sempra, owed Sempra the highest duty of loyalty. The Director Defendants either knew or were reckless in not knowing, (i) the Well was unsafe; and (ii) Sempra lacked an appropriate contingency plan in the event of a leak at the Well. These defendants further caused or allowed Sempra to fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so. These actions exposed Sempra to billions of dollars in damages. Accordingly, the Director Defendants breached their duty of loyalty to Sempra.

*Id.* at ¶ 156.

"Plaintiff has not made any demand on the present [Sempra] Board to institute this action because such a demand would be a futile, wasteful, and useless act." *Id.* at ¶ 139. "Demand is excused because the Director Defendants face a substantial likelihood of liability for their misconduct." *Id.* at ¶ 140. "[D]efendants Reed,

Rusnack, Jones, Ouchi, Brocksmith, Rutledge, Schenk. Boeckmann, Taylor, Yardley, Brown, and Ferrero breached their fiduciary duties of loyalty by failing to establish and promptly implement appropriate safety plans at the Well." *Id.* "Based on their own statements in the Company's SEC filings, it is clear that these defendants were well aware of the tremendous environmental, public health, and financial risks posed by the Well, yet failed to take meaningful action to mitigate those risks and prevent harm to people and the Company." *Id.* "Instead, these defendants created conditions which allowed the Well to fail, and then exacerbated the effects of the disaster by causing or allowing Sempra to fail to promptly notify authorities, fail to immediately begin construction of a relief well, and fail to timely provide adequate temporary housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so." *Id.*

"Defendants Reed, Rusnack, Jones, Ouchi, Brocksmith, Rutledge, Schenk. Boeckmann, Taylor, Yardley, Brown, and Ferrero knew that the safety valve at SS-25 had been removed in the past and approved SoCalGas's repeated decision to not replace the valve." *Id* at ¶ 141. "The Director Defendants knew the valve was missing and yet approved operating plans for Aliso Canyon which did not call for replacement of the valve." *Id.* "Such conduct constituted bad faith and a breach of the directors' duty of loyalty." *Id.*

The Directors were aware of increasing well integrity problems at Aliso Canyon and had proposed a SIMP in November 2015 but had not designated Well SS-25 for inclusion in the program. *Id.* at ¶ 142. Director Defendants had "actual knowledge as demonstrated by Phillip Baker's presentations that SoCalGas employed a wholly deficient and inadequate approach to natural gas well safety." *Id.* at ¶ 143. "Director Defendants were thus fully aware of an had approved at all relevant times a bifurcated approach to natural gas safety, pursuant to which well safety had been intentionally relegated to an inferior stepchild status . . ." *Id.* at ¶ 144. "The Director Defendants' reckless approach to natural gas well safety, and their intentional decision to not adopt

and implement a modern, effective, and comprehensive risk assessment program for the Company's gas wells, despite knowledge of increasing integrity problems at the wells constitutes bad faith and disloyal conduct - conduct which cannot be indemnified and thus which subjects the Director Defendants to a substantial likelihood of liability." *Id.* at ¶ 145.

The Director Defendants on the Environmental, Health, Safety and Technology Committee and Audit Committee face liability for failing to perform their specific duties associated with membership on the respective committees. *Id.* at ¶¶ 147-48.

## III. Contentions of the Parties

Nominal Defendants Sempra and SoCalGas contend that Plaintiff fails to satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 23.1.[5] (ECF No. 34-1). Nominal Defendants contend that Plaintiff failed to demand action from the Board of Directors or state with particularity why demand would be futile. *Id.* at 14-17. Nominal Defendants contend that Plaintiff alleges a failed oversight claim rather than challenging a specific Board action. *Id.* Nominal Defendants contend that Plaintiff fails to plead particularized facts to establish a reasonable doubt that a majority of directors were not independent or disinterested at the time the complaint was filed. *Id.* at 18. Nominal Defendants contend that Plaintiff fails to plead particularized facts showing that any "director's conduct was so egregious that he faces a 'substantial likelihood' of personal monetary liability." *Id.* at 19. Nominal Defendants contend that Plaintiff does not allege facts to show that the Outside Directors failed to implement any reporting or information systems or failed to oversee Sempra's operations and does not allege facts to show that a majority of Directors knew and ignored wrongdoing. *Id.* at 20-23. Nominal Defendants contend that Plaintiff's claim also fail to raise a reasonable doubt that the Board's actions were the product of a valid exercise of business judgment. *Id.* at 28. Nominal Defendants contend that exculpatory provisions limiting

---

[5] The Officer Defendants and Director Defendants join in the Nominal Defendants' motion to dismiss. (ECF No. 37 at 2; ECF No. 35 at 2).

the liability of directors in the Articles of Incorporation shield the Outside Directors from personal liability. *Id.* at 26-27.

Plaintiff contends that demand is properly excused and that he challenges a Board decision. (ECF No. 40 at 22). Plaintiff contends that he brings a claim based on bad faith and disloyal conduct rather than a failed oversight claim. *Id.* at 28. Plaintiff contends that the complaint challenges two Board actions: "(1) approving annual operating plans for the gas storage wells, including those at Aliso Canyon, that significantly underfunded gas storage well safety despite actual knowledge of an increasing trend of well integrity failures; and (2) taking actions that repeatedly relegated strong well safety to an inferior 'stepchild status.'" *Id.* at 17-18. Plaintiff contends that "the Director Defendants had knowledge of the lack of a safety valve in well SS-25, as well as the antiquated dilapidated conditions at the Aliso Canyon facility, yet consciously decided not to replace the valve or take any steps to prevent or remedy the situation." *Id.* at 18. Plaintiff contends that the Directors had actual knowledge of and, under the core-product doctrine, are presumed to have knowledge of well-safety issues. *Id.* at 24, 27. Plaintiff contends that the Directors are not disinterested because they face a substantial likelihood of personal liability for breaching their fiduciary duty of loyalty and good faith by "knowingly approv[ing] inadequate operating plans and fail[ing] to remedy the safety deficiencies." *Id.* at 23. Plaintiff contends that the Director Defendants' adoption and approval of plans that "repeatedly fail[ed] to comply with regulations governing well safety" constitutes illegal conduct that cannot be considered a valid exercise of business judgment. *Id.* at 19. Plaintiff contends that the exculpatory provision in Sempra's Articles of Incorporation does not absolve the Director Defendants of personal liability under California law. *Id.* at 30. Plaintiff requests leave to amend if the Court dismisses the complaint. *Id.* at 32.

## IV. Federal Rule of Civil Procedure 23.1

"The normal rule is that a corporation is run by its management and the corporation itself has the right to make claims." *Quinn v. Anvil Corp.*, 620 F.3d 1005,

1012 (9th Cir. 2010).  "A derivative action is an extraordinary process where courts permit 'a shareholder to step into the corporation's shoes and to seek in its right the restitution he could not demand in his own.'" *Id.* (quoting *Lewis v. Chiles*, 719 F.2d 1044, 1047 (9th Cir. 1983)). "Strict compliance with Rule 23.1 and the applicable substantive law is necessary before a derivative suit can wrest control of an issue from the board of directors." *Potter v. Hughes*, 546 F.3d 1051, 1058 (9th Cir. 2008).

Federal Rule of Civil Procedure 23.1 establishes the pleading requirements "when one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce." Fed. R. Civ. P. 23.1(a). Rule 23.1 states that a complaint in a shareholder's derivative action must "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). "A shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile." *In re Silicon Valley Graphics Inc. Securities Litigation*, 183 F.3d 970, 989 (9th Cir. 1999).  "Futility is gauged by the circumstances existing at the commencement of a derivative suit and concerns the board of directors sitting at the time the complaint is filed." *Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014).

To establish the circumstances under which demand would be futile, courts turn to the law of the state of incorporation. *Id.*  SoCalGas and Sempra were incorporated in California and the parties agree that the California law is applicable in this case. (ECF No. 40 at 17; ECF No 34-1 at 16; ECF No. 1 at 12).  While the Court applies California law, "California law is identical to Delaware law on the demand requirement." *Potter*, 546 F.3d at 1057.  California courts find certain Delaware cases to be instructive on the issue of demand futility in shareholder derivative suits. *See*

*Bader v. Anderson*, 101 Cal. Rptr. 3d 821, 833 n.5 (Cal. Ct. App. 2009); *Oakland Raiders v. Nat'l Football League*, 113 Cal. Rptr. 2d 255, 266 n.5 (Cal. Ct. App. 2001) ("The parties agree that we may properly rely on corporate law developed in the State of Delaware given that it is identical to California corporate law for all practical purposes").

Courts rely on two relevant tests to evaluate whether demand would be futile. *See Bader*, 101 Cal. Rptr. 3d at 833-34.  The *Aronson* test, enunciated in *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), is applicable when a plaintiff challenges a decision or action by the board of directors.  *See Bader*, 101 Cal. Rptr. 3d at 834. ("[T]he *Aronson* two-prong standard is well-suited to actions challenging conscious decisions by boards to act or refrain from acting . . .").  Under *Aronson*, demand is excused when "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 472 A.2d at 814.

Courts apply the *Rales* test "where the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit." *Rales v. Blasband*, 634 A.2d 927, 933-34 (Del. 1993).  "The absence of board action . . . makes it impossible to perform the essential inquiry contemplated by *Aronson* – whether the directors have acted in conformity with the business judgment rule in approving the challenged transaction."  *Id.* at 933.  Under *Rales*, the second prong of *Aronson* is inapplicable and the plaintiff must plead "particularized factual allegations . . . creat[ing] a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."  *Id.* at 935.

"At the pleading stage, Board independence and compliance with the business judgment rule are presumed." *In re Silicon*, 183 F.3d at 990.  "The derivative plaintiff seeking demand excusal based on a director's lack of independence must allege specific

facts that cast doubt as to whether the director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Bader*, 101 Cal. Rptr. 3d at 834 (quotations omitted).  A director is "interested" where "the facts alleged demonstrate a potential personal benefit or detriment to the director as a result of the decision." *Id.* "[T]he mere threat of personal liability for approving a questioned transaction, standing alone is insufficient to challenge either the independence or disinterestedness of directors." *In re Silicon*, 183 F.3d at 990 (quoting *Aronson*, 473 A.2d at 814).  "Demand will be excused only if the plaintiff's allegations show the defendant's actions were so egregious that a substantial likelihood of director liability exists." *Id.* (quotations omitted).

To excuse demand under the second prong of *Aronson*, Plaintiffs must plead "particular facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision." *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 824 (Del. Ch. 2005).

**V. Discussion**

### A. Applicable Test

Plaintiff must state with particularity the reasons why demand upon the Sempra Board would have been futile pursuant to Rule 23.1.  To determine whether Plaintiff has sufficiently alleged demand futility, the Court first considers whether to apply the analysis of *Rales* or *Aronson* in this case.  Nominal Defendants contend that the Court should apply *Rales* because Plaintiff does not challenge a specific Board action, but rather challenges Board inaction.  Nominal Defendants contend that Plaintiff alleges a failed oversight theory which is properly considered under *Rales*.  Plaintiff contends that *Aronson* is applicable because the Board had knowledge of illegality or substantial wrongdoing and made a conscious decision not to act.

Plaintiff alleges that demand is futile because the Sempra Directors face a substantial likelihood of liability for knowingly engaging in the following acts of bad

faith and breaches of the duty of loyalty: (1) failing to establish and promptly implement appropriate safety plans at the Well despite "knowledge of the tremendous environmental, public health, and financial risks posed by the Well"; (2) approving operating plans for Aliso Canyon which did not call for replacement of the safety valve despite knowledge that the valve was missing; (3) following a "reckless approach to natural gas well safety and . . . intentional[ly] deci[ding] to not adopt and implement a modern, effective and comprehensive risk assessment program for the Company's natural gas wells, despite knowledge of increasing integrity problems at the wells"; (4) failing "to immediately notify authorities of the leak as required by law" and "timely provide adequate temporary housing for thousands of affected residents." (ECF No. 1 at ¶¶ 140-149). Initially, the Court must determine whether these allegations challenge a Board decision or challenge Board inaction.[6]

Under a conscious inaction theory, a shareholder-plaintiff alleges particularized factual allegations leading to a plausible "inference that the directors had remained consciously inactive in the face of wrongdoing at their companies." *Rosenbloom*, 765 F.3d 1137 at 1156. While *Rales* is the applicable test for a derivative suit that does not challenge a decision of the board, courts may apply *Aronson* where a plaintiff challenges a board's failure to act and the allegations are sufficient to infer that the board knew of the problems and decided no action was required. *See Bader*, 101 Cal. Rptr. 3d at 834. In this case, Plaintiff alleges that the Sempra Board failed to take certain actions, such as implementing different safety measures at Well SS-25, replacing the safety valve, reporting the leak earlier, and responding to the leak in a different way. *Aronson* is inapplicable to this case unless particularized allegations support a reasonable inference that the Board made a conscious decision not to take these actions.

Plaintiff first contends that the Sempra Board was aware that the safety valve had been removed in 1979 and repeatedly made the decision to not replace it. Plaintiff

---

[6] Plaintiff relies on these allegations in support of demand futility. (ECF No. 1 at ¶¶ 140-149).

alleges that, "On December 15, 2015, Rodger Schwecke ("Schwecke"), a SoCalGas executive who was helping to coordinate the response to the leak, was asked by reporters about the safety valve . . . [and] admitted that the safety valve was not damaged; it was actually removed in 1979." (ECF No. 1 at ¶ 85). The allegation that a SoCalGas executive stated that the safety valve had been removed in 1979 in the months after the leak does not support a reasonable inference that the Sempra Board had knowledge that the safety valve had been removed and repeatedly decided not to replace it, particularly in light of the fact that the Complaint alleges that none of the current Sempra Directors served on the Board prior to 1998. *Id.* at ¶¶ 27-41. Plaintiff's allegation that the Sempra Directors knew that the safety valve at Well SS-25 had been removed and approved SoCalGas's repeated decision not the replace the valve is unsupported by particularized factual allegations as required under Rule 23.1.

Plaintiff alleges that the presentation to the CPUC by Phillip Baker establishes that the Sempra Board knew of substantial risks regarding the Aliso Canyon wells. *Id.* at ¶ 88. Plaintiff alleges that the Company "admitted the substantial capital improvements needed at Aliso Canyon underground wells" and "admitted that it had not spend the same resources on well safety as it had on gas transmission pipelines" in the Baker presentation. *Id.* at ¶¶ 88-89. Baker allegedly stated that, "without a robust program to inspect underground storage wells to identify potential safety and/or integrity issues, problems may remain undetected" and that "a negative well integrity trend seems to have developed since 2008." *Id.* at ¶ 94. However, the alleged Baker presentation to the CPUC was not specific to Well SS-25, one of approximately 116 wells at Aliso Canyon, and fails to show Board knowledge of substantial safety risks associated with Well SS-25. The Court concludes that the allegations regarding the Baker presentation do not permit a reasonable inference that the Sempra Board knew of inadequate safety measures at Well SS-25 and deliberately pursued plans that de-emphasized well safety. Rather, the allegations related to the Baker presentation permit a reasonable inference that Sempra Board was pursuing its oversight duties by seeking

general well safety improvements through the proposed SIMP. Without particularized facts demonstrating that the Board had knowledge of safety concerns specific to Well SS-25, the Court cannot infer that alleged failure to designate Well SS-25 for the pending SIMP or adopt other well safety measures in relation to Well SS-25 were conscious decisions not to act.

Plaintiff further alleges the Board deliberately delayed reporting the leak and knowingly responded inadequately to the leak. Plaintiff alleges that SoCalGas discovered the leak on October 23, 2015 "during one of its twice-daily well observations" and reported the leak to the general public on October 26, 2015. *Id.* at ¶¶ 1 n.1, 83. However, Plaintiff's conclusory allegation that "the Director Defendants caused Sempra to delay by at least five days notifying the authorities of the leak" is unsupported by particularized facts supporting a reasonable inference that the Sempra directors had knowledge of the leak and deliberately delayed reporting during this time period. *Id.* at ¶ 83. Similarly, Plaintiff alleges that Sempra's response to the leak has been "woefully inadequate[] and painfully slow[]." *Id.* at ¶ 17. Plaintiff alleges that the Sempra Directors "caused or allowed Sempra to fail to timely provide adequate housing to the thousands of affected residents, despite specific orders from the Health Department instructing Sempra to do so" and alleges that the inadequate response contributes to the substantial likelihood of liability. *Id.* at ¶¶ 27-51. However, Plaintiff fails to allege particularized facts to support the allegation that any Sempra Director "caused or allowed" this alleged inadequate response. The allegations of the complaint are insufficient to establish that the Board consciously failed to respond adequately to the leak or deliberately violated an order from the Health Department.

Because Plaintiff fails to allege particularized facts leading to a reasonable inference that the Sempra Board had knowledge of wrongdoing and inadequate safety measures related to Well SS-25, the Court cannot reasonably infer that the Board made

a conscious decision not to take a certain action.[7]  Accordingly, the Court determines that the analysis in *Rales* properly applies under these alleged facts because the complaint does not challenge a decision by the Sempra Board.

## B. Demand Futility Under *Rales*

To adequately allege demand futility under *Rales*, a complaint must contain "particularized factual allegations . . . creat[ing] a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 935.   Plaintiff must allege particularized facts sufficient to create a reasonable doubt as to six of the twelve directors at the time the complaint was filed.[8] *See Louisiana Mun. Police Employees' Ret. Sys. v. Wynn*, 829 F.3d 1048, 1058 (9th Cir. 2016).

Plaintiff alleges that the Sempra Directors are not disinterested because they face a substantial likelihood of liability arising from breaches of fiduciary duties.  Director disinterest can be challenged on the grounds that a director faces a substantial likelihood of liability; however,  "the mere threat of personal liability for approving a questioned transaction, standing alone is insufficient to challenge either the independence or disinterestedness of directors." *In re Silicon*, 183 F.3d at 990 (quoting *Aronson*, 473 A.2d at 814).  Plaintiff alleges that the Sempra Directors breached their fiduciary duty

---

[7] Plaintiff contends that "the core-product doctrine forms an additional basis for inferring [Board] knowledge and conscious misconduct" because "storage and distribution of gas are SoCalGas' core – in fact sole – product." (ECF No. 40 at 27). "In demand futility cases, courts have repeatedly emphasized that it is especially plausible to infer board interest in and knowledge of developments relating to a product that is critical to a company's success or is otherwise of special importance to it." *Rosenbloom*, 765 F.3d at 1154.  The complaint alleges that there are approximately 116 wells at Aliso Canyon and that Aliso Canyon is one of the Company's four underground natural gas facilities. (ECF No. 1 at ¶ 75,78).  The Court concludes that it cannot infer that the Sempra Board had knowledge of safety issues at Well SS-25 based on the core product doctrine.

[8] Plaintiff alleges that Sempra Board at the time the complaint was filed consisted of Defendants Reed, Rusnack, Jones, Ouchi, Brocksmith, Rutledge, Schenk, Boeckmann, Taylor, Yardley, Brown, and Ferrero.   (ECF No. 1 at ¶ 139).

in relation to the Well SS-25 because they knew or should have known that Well SS-25 was unsafe and that Sempra lacked an appropriate contingency plan in the event of a leak and then failed to take appropriate actions following the leak. (ECF No. 1 at ¶ 156).

Plaintiff's allegations that the Sempra Board failed to take appropriate action are properly construed as a claim that the Board failed to exercise proper oversight of Well SS-25.   Plaintiff must establish a substantial likelihood of liability on this failed oversight claim in order to create a reasonable doubt as to director disinterest and satisfy *Rales*.  *See Rosenbloom*, 765 F.3d 1137, 1150 (9th Cir. 2014) (holding that demand futility for *Caremark* failed oversight claims is tested under *Rales*).  Directors are liable for failed oversight in two circumstances articulated in *In re Caremark Intern., Inc. Derivative Litigation*, 698 A.2d 959 (Del. Ch. 1996) ("*Caremark*").  In *Caremark*, a Delaware court considered a motion to approve a proposed settlement of a consolidated derivative action dealing with a claim that the "directors allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in doing so they violated a duty to be active monitors of corporate performance."  698 A.2d at 967.

> *Caremark* articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.  In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations.  Where directors fail to act in the face of a known duty to act, thereby demonstrating conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

*Stone ex rel. AmSouth Bancorporation v. Ritter,* 911 A.2d 362, 370 (Del. 2006).  "A 'stockholder cannot displace the board's authority [over the corporation's claims] simply by describing the calamity and alleging that it occurred on the directors' watch." *South v. Baker*, 62 A.3d 1, 14 (Del. Ch. 2012).  "Without a connection to the board, corporate trauma will not lead to director liability.  Without a substantial threat of director liability, a court has no reason to doubt the board's ability to address the

corporate trauma and evaluate a related demand." *Id.* Stating an oversight claim is "possibly the most difficult theory in corporate law upon which a plaintiff might hope to win a judgment." *Caremark*, 698 A.2d at 967.

Plaintiff does not contend that the Sempra Directors "utterly failed to implement any reporting or information system or controls." *Stone*, 911 A.2d at 379. Plaintiff must therefore allege particularized facts showing a substantial likelihood of liability arising from the Directors' "fail[ure] to act in the face of a known duty to act" and "conscious disregard" of their fiduciary obligations. *Id.* at 370. Plaintiff's complaint contains allegations indicating that the Sempra Board was monitoring and overseeing its obligations pursuant to their fiduciary duties. Plaintiff alleges that in recent Proxy Statements, the Company stated that, "the board has developed an integrated risk management framework to assess prioritize manage and monitor risks across the company's operations" and that "[t]he board fulfills its risk oversight function through receipt of reports provided both directly to the board and to appropriate board committees. Based on these reports, the board or appropriate committees establish or amend existing risk oversight and control mechanisms." (ECF No. 1 at ¶ 68). Plaintiff alleges that the proposed SIMP sought to "mitigate safety-related risks relating to the Company's underground natural gas storage wells." *Id.* at ¶ 98. Plaintiff has not alleged particularized facts demonstrating that the Sempra Board "consciously failed to monitor or oversee its operations, thus disabling them from being informed of risks or problems requiring their attention." *Stone*, 911 A.2d at 370. Additionally, as discussed previously, Plaintiff has not sufficiently alleged that the Sempra Board had knowledge of and ignored misconduct or safety risks associated to Well SS-25. Plaintiff provides conclusory statements that the Board was aware of misconduct, but does not provide particularized facts sufficient to support an inference the Board was or should have been aware of risks or misconduct related to Well SS-25.

Plaintiff has not adequately alleged that the Sempra Board failed to act in the face of a known duty to act and his allegations cannot support an inference of a substantial

likelihood of liability on this *Caremark* failed oversight claim.  Plaintiff has therefore not pled sufficient factual material to create a reasonable doubt as to the Sempra Directors' disinterest and independence and has not adequately pleaded demand futility under *Rales*.

### C. Demand Futility Under *Aronson*

 Courts in the Ninth Circuit have recognized some "doctrinal uncertainty" as to the applicable framework for claims that "a board remained consciously inactive when it knew (or should have known) about illegal conduct." *Rosenbloom*, 765 F.3d at 1150. In *Rosenbloom,* the Ninth Circuit Court of Appeals considered a shareholder's derivative claim in which the plaintiffs "insist[ed] that their conscious inaction claims [were] subject to *Aronson* analysis" while the corporation maintained "that those claims invoke[d] the theory of oversight liability set forth in [*Caremark*]." 765 F.3d at 1150. However, the Court of Appeals in *Rosenbloom* held that the distinction between *Rales* and *Aronson* blurs in cases alleging demand futility based on the directors' substantial likelihood of liability because a substantial likelihood of liability can create a reasonable doubt as to director disinterest as well as protection under the business judgment rule. *See id.* at 1150-51 ("We need not decide which characterization of Plaintiff's allegations is correct because, either way, demand is excused if Plaintiffs' particularized allegations create a reasonable doubt as to whether a majority of the . . . Board faces a substantial likelihood of liability for failing to act in the face of a known duty to act.").

 Plaintiff contends that his complaint alleges a conscious inaction theory similar to *In re Abbott Laboratories Derivative Shareholders Litigation,* 325 F.3d 795, 799 (7th Cir. 2003), and *Rosenbloom v. Pyott*, in which the courts determined that plaintiffs adequately alleged demand futility.  In these cases, particularized allegations that the directors received a series of "red flags" of illegal conduct "made plausible an inference that the directors at issue had remained consciously inactive in the face of wrongdoing at their companies." *Rosenbloom*, 765 F.3d at 1156.  In doing so, the boards violated

their duty of loyalty and faced a substantial likelihood of liability. *See id.* at 1151. However, this case is distinguishable because Plaintiff's allegations do not permit a reasonable inference that the Board consciously disregarded red flags of substantial wrongdoing or illegal activity comparable to the cases cited by Nominal Defendants.

In *Rosenbloom v. Pyott*, the Ninth Circuit Court of Appeals determined that a plaintiff had adequately alleged demand futility in a conscious inaction case where the complaint alleged that the board of Allergan, a pharmaceutical manufacturer of Botox, "knew, or due to a series of red flags, should have known about Allergan's off-label promotion of Botox" in violation of federal law. *Rosenbloom*, 765 F.3d at 1151. Among the "red flags" of illegal activity, the board received repeated FDA warnings about illegal promotion of Botox. The Court of Appeals determined, "[T]hese letters also constituted a red flag, waved nearly every year for five straight years, that Allergan was breaking federal law in its promotion of Botox." *Id.* The Court held that the repeated FDA warnings, along with the significant magnitude and duration of the illegal conduct, the fact that the illegal conduct involved one of the most important drugs at Allergan, data presented to the board about the fluctuations of off-label sales, and particularized allegations that the board closely monitored off-label sales, created a reasonable inference of conscious inaction. *Id.* at 1151-56; *see also In re Abbott*, 325 F.3d at 809 ("We find that six years of noncompliance, inspections . . . , [FDA] Warning Letters, and notice in the press, all of which them resulted in the largest civil fine ever imposed by the FDA and the destruction and suspension of products which accounted for approximately $250 million in corporate assets, indicate that the directors decision not to act was not made in good faith and was contrary to the best interests of the company." ).

In this case, Plaintiff cannot satisfy Rule 23.1 under a conscious inaction theory because Plaintiff does not allege particularized facts sufficient to support a reasonable inference that the Sempra Directors were aware of wrongdoing related to Well SS-25. In *Abbott* and *Rosenbloom*, the plaintiffs alleged that the boards received and ignored

multiple letters from the FDA specifically informing the boards of illegal conduct.  In this case, the complaint contains conclusory statements that the Directors "were well aware of the tremendous environmental, public health, and financial risks posed by the Well" but failed to take action to mitigate those risks and in fact "created conditions which allowed the Well to fail." *Id.* at ¶ 54.  However, Plaintiff fails to allege particularized facts permitting a reasonable inference that the Directors were conscious of, and deliberately chose to ignore, wrongdoing associated with Well SS-25.  Plaintiff's allegations regarding Schwecke's statements about the safety valve, the Baker presentation, and the delayed reporting of the leak do not permit a reasonable inference that the Sempra Board was aware of any illegal conduct or substantial wrongdoing in relation to Well SS-25.  Plaintiff fails to allege demand futility under *Aronson* and *Rales*  because his allegations fail to establish that the board had the requisite knowledge under either test.

Plaintiff's allegations of demand futility regarding the Sempra Directors are also distinguishable from the conscious inaction cases cited by Plaintiff, because the complaint does not allege particularized facts that support a reasonable inference of illegal conduct or significant wrongdoing.  In *Abbott* and *Rosenbloom*, the boards were alleged to have received red flags that contained notice of conduct that was specifically illegal.  In this case, Plaintiff does not allege facts sufficient to support a reasonable inference that the Sempra Board should have been aware of illegal or any liability-creating conduct in relation to Well SS-25.  Plaintiff alleges that Baker's presentation to the CPUC sought general improvements to overall well safety, but Plaintiff does not alleged that the Baker presentation disclosed any conduct that was illegal.  Similarly, Plaintiff has not alleged facts sufficient to infer that, even if the Sempra Board was aware of it, the removed safety valve would constitute illegal conduct or wrongdoing. The allegations of the complaint do not allow a reasonable inference that the Sempra Directors knew or should have known of illegal activity or wrongdoing and then consciously failed to act.  Plaintiff has not alleged sufficient facts to demonstrate that

1  a majority of the Sempra Board faces a substantial likelihood of liability from breaching
2  their duty of loyalty.

3  **VI. Conclusion**

4        Plaintiff has not alleged facts sufficient to infer a substantial likelihood of
5  liability and satisfy the demand futility requirement under either *Rales* or *Aronson*. *See*
6  *Rosenbloom*, 765 F.3d at 1150 ("Under either approach, demand is excused if Plaintiffs'
7  particularized allegations create a reasonable doubt as to whether a majority of the
8  board of directors faces a substantial likelihood of personal liability for breaching the
9  duty of loyalty."). Accordingly, Plaintiff has not established that he is entitled to bring
10  this shareholder's derivative action on behalf of Sempra and SoCalGas.[9]

11        IT IS HEREBY ORDERED that the motion to dismiss filed by Sempra and
12  SoCalGas is GRANTED. (ECF No. 34). The complaint is dismissed without prejudice.
13  Plaintiff shall file any motion for leave to file an amended complaint within thirty (30)
14  days of the day this Order is issued.

15        IT IS FURTHER ORDERED that the motions to dismiss filed by the Officer
16  Defendants and Director Defendants are denied as moot. (ECF Nos. 35, 37).

17  DATED:  March 29, 2017

18                           *William Q. Hayes*
19                          **WILLIAM Q. HAYES**
                        United States District Judge

---

[9] Nominal Defendants contend that Plaintiff may not have standing to sue derivatively on behalf of SoCalGas, a double derivative action, because he does not own any stock in SoCalGas. (ECF No. 16-17 n.4). Plaintiff's demand futility allegations are specific to the Sempra Board and fail to satisfy Rule 23.1. Plaintiff does not provide any basis for the Court to conclude that Plaintiff may sue derivatively on behalf of SoCalGas independent of its connection to Sempra.